# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF CONNECTICUT
## Hartford Division

Rahulkumar M Patel,

M7 Investment Fund I LLC, a New Jersey
limited liability company,

DNA Lodging LLC, a Connecticut
limited liability company,

DNA 789 CT AVE LLC, a Connecticut
limited liability company,

**Plaintiff,**

**v.**

Mount Street US LLP,
a Georgia Foreign Limited Liability Partnership,

CWCapital Asset Management LLC,
a Delaware limited liability company,

789 Connecticut Avenue Holdings, LLC
a Connecticut limited liability company,

Wilmington Trust, National Association,
as Trustee, for the benefit of the Holders of
COMM 2015-CCRE23 Mortgage Trust,
Commercial Mortgage Pass Through Certificates,

Darshan Gandhi,

Nirav Patel,

Amit Shah,

**Defendants.**

Civil Action No.: _____

**Jury Demand -YES**

<u>Sealed Motion due to Medically Condition</u>

APR 3 2023 AM 10:59
FILED-USDC-CT-HARTFORD

**COMPLAINT FOR A CIVIL CASE**
**ALLEGING BREACH OF CONTRACT**
**(28 U.S.C. § 1332; Diversity of Citizenship)**

## I.        The Parties to This Complaint

**The Plaintiffs**

Rahulkumar M. Patel
DNA Lodging LLC
M7 Investment Fund I LLC
DNA 789 CT AVE LLC
121 Providence New London Turnpike
North Stonington, CT 06359
New London County
646-474-3177
M7partners@gmail.com

**The Defendants**

Mount Street US LLP
3 Columbus Circle
Floor 15,
New York, NY 10019
New York County
646-206-0081
James.winikor@mountstreetllp.com
paul.lloyd@mountstreetllp.com
Kristin.Bonczynski@mountstreetllp.com
wit.solberg@missionpeakcapital.com

CWCapital Asset Management LLC
CW Capital LLC
900 19th St NW – 8th Floor
Washington, DC 20006
202-715-9500
info@cwcapital.com

789 Connecticut Avenue Holdings, LLC
2839 Paces Ferry Road,
Suite 200,
Atlanta, GA 30339
Fulton County
770 694 7192
James.winikor@mountstreetllp.com
paul.lloyd@mountstreetllp.com
Kristin.Bonczynski@mountstreetllp.com
wit.solberg@missionpeakcapital.com


Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of COMM 2015-CCRE23
Mortgage Trust, Commercial Mortgage Pass Through Certificates
1100 N. Market Street
Wilmington, DE 19890
New Castle County
302-636-4140
Cmbstrustee@wilmingtontrust.com


Darshan Gandhi
707 South Washington Street
North Attleboro, MA 02760
Bristol County
508-801-2026
Rudrahhospitality@gmail.com


Nirav Patel
1947 East Ranch Road
Tempe AZ 85284
Maricopa County
614-296-1226
npatel@hdmgmt.net


Amit Shah
10057 New Devon St.
Munster, IN 46321
Lake County
219-614-2676
amitshah82@gmail.com

## II.     JURISDICTION AND VENUE


Plaintiff Rahulkumar M. Patel ("Rahul" or "I"), who is a permanent resident of the State of Connecticut, is the sole member of a M7 Investment Fund I LLC and is the sole member of a DNA Lodging LLC.

Plaintiff M7 Investment Fund I LLC ("M7") is a New Jersey limited liability company.

Plaintiff DNA Lodging LLC ("DNA") is a Connecticut limited liability company.

Plaintiff DNA 789 CT AVE LLC ("DNA 789") is a Connecticut limited liability company.


Defendant Mount Street US LLP ("MSU") is a Georgia foreign limited liability partner and is domiciled in United Kingdom.

Defendant CWCapital Asset Management LLC is a Delaware limited liability company.

Defendant CWCapital LLC is a Delaware limited liability company.

CWCapital Asset Management LLC and CWCapital LLC will be called CW.

Defendant 789 Connecticut Avenue Holdings, LLC ("Seller") is a Connecticut limited liability company.

Defendant Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of COMM 2015-CCRE23 Mortgage Trust, Commercial Mortgage Pass Through Certificates ("Wilmington"), is a Delaware limited liability company.

Defendant Darshan Gandhi ("Darshan"), who is a citizen of the state of Massachusetts.

Defendant Nirav Patel ("Nirav"), who is a citizen of the state of Arizona.

Defendant Amit Shah ("Amit"), who is a citizen of the state of Indiana.

This Court has subject-matter jurisdiction over this dispute under 28 U.S.C. 1332, because it involves the citizens of a state (Connecticut) and the amount in controversy exceeds $75,000.

Venue in this district is proper because the state is in Connecticut.

## III.    Statement of Claim

### Summary

### June 1, 2019 Day Time, Rahul is working.

DNA won the deal and was signed on 5/3/19 and close by 7/17/19 or faster.  The First American had a escrow account until the 45 days passed, so about 16 days on June 17, 2019, and Seller would get the deposit.  The loan is ready with deposit on May 31, 2019.  I did a FedEx and will be done in about 30 days but we plan on July 1, 2019.

The investors were getting ready too with RealCrowd (crowd funding) approved for our 2nd deal and Yam Capital with a loan.

We had plenty of time with a July 17, 2019 close deadline.  A Purchase and Sale Agreement price of $15,500,000.00.

The Ten-X auction is on April 3, 2023, today, through April 5, 2023 and a temporary restraining order is necessary.

### June 1, 2019 Evening, Rahul is about to go stroke:

I arrived at a friend's house at around 6pm and all of our close families are there.  At about 6:20pm I suffered a stroke but didn't know that a June 13, 2019.  I was told that I was up and down until June 13, 2019.

### June 1, 2019 through June 11, 2019, Rahul was sleeping due to the stroke.

Pratiksha called a friend and CW, Rakesh Patel ("Rakesh"), on June 3, 2019 or so.  He was told that Rahul suffered a stroke.  Rakesh said let's not call CW because maybe Rahul may wake up.  This is a top employee at CW and he said let's not call.  June 17, 2019 is the expiration of Due Diligence.  Then on June 10 or 11, she said Rahul is still not up.  So, Rakesh said okay and I should now tell them, CW, that Rahul is suffered a stroke.  Then later of June 10 or 11, Pratiksha faxed a signed but moving the house to

her parents, she lost the document.  Then on June 11, 2019, the partner Darshan Gandhi and CW signed

the Termination.

### Overview

But Pratiksha was my girlfriend but not wife and that was wrong.  And Rakesh knew that she is a

girlfriend since 2009 at least and because we talked about it at his home at East Rockaway, NY (probably

couple times afterwards).  And on May 28, 2019, Darshan Gandhi and I opened a company called DNA

789 and we both agreed and agreement, oral written, until we put it on written.  Then I suffered a stroke

on about 6:15pm on June 1, 2019.  Also, by the Due Diligence deadline of June 17, 2019, my dad,

Manherlal Patel would have a Managing Director for himself and then got an attorney-in-fact for me, so

we had 30 days to close on July 17, 2019.

In 2019, Rahul, through his company DNA, attempted to purchase the DoubleTree by Hilton

Hotel Norwalk in Connecticut. On May 3, 2019, DNA entered into a purchase and sale agreement ("PSA")

with 789 Connecticut Avenue Holdings, LLC.

The members of DNA are M7 , Darshan Gandhi, Amit Shah, and Nirav Patel. The Seller is owned

by Wilmington Trust for the benefit of the 2014-CCRE23 Mortgage Trust, and its "special servicer" is

CWCapital Asset Capital Management LLC.

On June 1, 2019, according to the terms of the PSA, Rahul had 16 days to complete due diligence

and then 30 days to close the deal or July 17, 2019

With the loan secured, he was about 30 days from closing. Additionally, on May 7, 2019,

Realcrowd approved DNA for the second time, which would have allowed DNA to attract investors in a

few weeks.

However, on June 1, 2019, Rahul suffered a stroke. As a result, Darshan Gandhi, another

manager of DNA, cancelled the deal.  But Darshan was agreed that DNA 789 that I and Darshan agreed

that DNA and PSA would be set towards DNA 789.  Darshan and I agreed that DNA 789 to be now control

of DNA and PSA. On May 28, 2019, Darshan and I said by oral until we are written. But I suffered a stroke on June 1, 2019.

Each member of DNA was trying to put together real estate acquisition deals, in which they would also find investors to finance the acquisition, and then present the deal to the other DNA members who could either join the deal or let the partner proceed with the deal individually. This is what happened with the deal on the Hartford hotel and the DNA deal was the second deal. I did both deals and all four partners, Darshan, Nirav, Amit and Rahul (me) were still the partners for their credit, investors, etc. Hartford deal was, after fees to other partners. was effectively mine. This is what happened, but stroke stop me, and a fraud began.

I would have paid the total purchase price without them, Darshan, Nirav and Amit but I got a stroke.

With RealCrowd was ready after approved for second deal, like Hartford deal, the DNA with investors were ready. But I got stroke, and the Seller and Darshan got the Termination. This was a fraud because Seller and Rakesh knew about 2009 showing them, I am single and not a husband. Pratiksha should know she was single too. She now knows and files head of household.

However, Darshan and Rakesh conspired to have Pratiksha execute the termination notice and then DNA (via Darshan) ratify it. I told me that she, Pratiksha, signed deposit on 6/10/2019 but now stroke on June 1, 2019. At Termination, Darshan and CW signed but its fraud.

It is alleged that the cancellation was due to fraud and misconduct by the defendants, "special servicer" CW, and other parties involved in the transaction.

The plaintiff, Rahul, alleges that the defendants engaged in fraudulent behavior by cancelling the deal and breaching the PSA without a valid reason.

The evidence points to this fraudulent intent to be that the website for DNA was taken down by three partners of DNA and the Seller had two bids on the property after the termination. Ultimately,

Seller still owns the property but my investors in Hartford and potential investor for DNA got "spooked". That's why Darshan, Nirav and Amit are fraud.

Because Rakesh and CW knew, Darshan could not sign on behalf of DNA without my approval, and that he did not have it. DNA 789 would not allow the Termination but it did because ,Darshan, he ignoring it. Manherlal Patel would have a Managing and attorney-by-fact for me from the 6 days (June 11, 2019 through June 17, 2019) but the Termination already happened. The Seller and the partners didn't give me time and on June 11, 2019 sign Termination but 6 days on June 17, 2019 was still open when it was Termination on June 11, 2019. That's why it is fraud.

CW and MSU both authorized to be special servicer. First CW and then about late 2021 it became MSU. The owner, Wilmington, is still owner but will auction on April 3, 2023 and end it with a winner on April 5, 2023. A temporary restraining order, preliminarily, and permanently was be another letter on April 3, 2023 as well.

This action caused damages to Rahul, including the loss of opportunity to acquire the DoubleTree by Hilton Hotel Norwalk. As a result, Rahul is seeking compensation for damages caused by the defendants' actions.

### Statute of Limitation and Covid-19

The 3 years statute of limitation was tolled by Covid-19. The Governor Ned Lamont had tolled the statute of limitation and was to start on March 10, 2020 and end on March 1, 2021 or 347 days. So the 3 years statute of limitation plus a Covid-19 of 347 days gives me enough days to expiration of May 13, 2023. Also, a 6 year statute of limitation is by May 14, 2026. See at Taylor v. Pillai on 9/6/2022.

### Stroke and Appointed for Pro Bono Counsel

I am still about halfway after the stroke and my doctor neurologist has seen the progress but not even close to 100%. Dr. Derek Cheng, the neurologist, said he doesn't know if I will get 100% of language.

The aphasia is the condition I've had since June 1, 2019.  I needed an appointed for pro bono for this case.

The court decided that an appointment for pro bono is necessary in a difference case.  SEC v. Rahulkumar M. Patel on 8/15/22 by #34.  I am denying on the case 3:21-cv-00994-SVN:

- "ORDER VACATING IN PART 24 AND APPOINTING PRO BONO COUNSEL. In its previous Order, the Court denied Defendant's request for an appointment of pro bono counsel on the ground that Defendant had not demonstrated the likely merit of his defense. ECF No. 24 at 5-8. After vacating the default entry, the Court directed the parties to file their Rule 26(f) Report, which they have done. After reviewing the report, the Court finds grounds on which to sua sponte reconsider its denial of Defendant's request for pro bono counsel and appoint him pro bono counsel.

  "A motion for reconsideration is committed to the sound discretion of the court." Kregos v. Latest Line, Inc., 951 F. Supp. 24, 26 (D.Conn. 1996). In general, the three grounds justifying reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.) (internal quotation marks omitted), cert. denied, 506 U.S. 820 (1992).

  Upon review of the parties' Rule 26(f) Report, ECF No. 30 , it became clear to the Court that the parties had significant difficulty proposing a schedule of discovery on account of Defendant's difficulties communicating. The Court ordered

Defendant to file a letter from his physician following an appointment referenced in the Report, which Defendant did at ECF No. 32 . The letter indicates that Defendant continues to suffer a medical condition "affecting his ability to speak and understand language," stemming from a stroke he experienced in 2019. ECF No. 32 at 3.

The Rule 26(f) Report and this letter together constitute new evidence justifying reconsideration of the Court's denial of Defendant's earlier request for pro bono counsel. Specifically, the Second Circuit has sustained a district court's reconsideration of any ruling in which the court overlooked evidence "that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 225, 257 (2d Cir. 1995). Although this is a "strict" standard, id. at 256, the Court finds it satisfied here. The Court's initial ruling represented that Defendant had not elaborated on the severity of his impairments or how those impairments impacted his ability to defend the case. ECF No. 24 at 7. However, the nature and severity of Defendant's impairments have now been made apparent from the parties' Rule 26(f) Report and Defendant's most recent letter from his physician. Most importantly, Defendant appears unable to communicate with opposing counsel on matters as basic as scheduling, due to his medical condition. Accordingly, his ability to defend the case is severely impacted. See Tinaway v. Merrill Lynch & Co., 661 F. Supp. 937, 940 (S.D.N.Y. May 20, 1987) (appointing counsel where the litigant was a "seventy eight year old stroke victim who is virtually deaf and who has difficulty walking"). The complexity of the securities fraud claims raised against him

further counsels in favor of appointing counsel. Finally, the Court acknowledges its previous reasoning that Defendant's Answer, ECF No. 23 , was insufficient to apprise the Court as to the strength of his defense. ECF No. 24 at 6. However, given the apparent severity of Defendant's medical condition and its observable impact on his ability to communicate, it appears clear that Defendant will be unable to demonstrate the likely merit of any defenses absent assistance from counsel. Thus, the Court concludes that the only way to prevent manifest injustice in this case is to appoint pro bono counsel. See Dingwell v. Cossette, No. 3:17-CV-1531 (KAD), 2021 WL 413619, at *1 (D. Conn. Feb. 5, 2021) ("In the context of a motion for reconsideration, 'manifest injustice' is defined as an error committed by the trial court that is direct, obvious, and observable." (citation and internal quotation marks omitted)).

Accordingly, the Court hereby vacates that part of its ruling denying Defendant's request for pro bono counsel at ECF No. 24 . Furthermore, the Court grants Defendant's prior request for an appointment of pro bono counsel. The Clerk is directed to appoint pro bono counsel for Defendant. Within 30 days after appointment of pro bono counsel, Defendant shall file a notice confirming that pro bono counsel has conferred with his or her client and indicating whether Defendant requests to file an amended pleading. Within 45 days after appointment of pro bono counsel, the parties shall file a second amended Rule 26(f) Report.

Signed by Judge Sarala V. Nagala on 8/15/2022. (Rennie, Carolyn) (Entered: 08/15/2022)"

**LEGAL STANDARDS**

Fraud: Fraud is the intentional misrepresentation or concealment of a material fact, made with knowledge of its falsity and with the intent to deceive another party, which causes the other party to suffer damages. In order to establish fraud, the plaintiff must prove the defendant's intent, knowledge of falsity, justifiable reliance, and damages.

Breach of Contract: A breach of contract occurs when one party fails to perform its obligations under a valid and enforceable contract. To establish a breach of contract, the plaintiff must prove the existence of a valid contract, the defendant's failure to perform its obligations under the contract, and damages resulting from the breach.

Conspiracy: Conspiracy is a combination of two or more persons to do an unlawful act or to do a lawful act by unlawful means. To establish a conspiracy, the plaintiff must prove the existence of an agreement between two or more persons, an unlawful objective, and an overt act in furtherance of the conspiracy.

Negligent Misrepresentation: Negligent misrepresentation occurs when a party makes a false statement negligently or without a reasonable basis for believing it to be true, and the other party reasonably relies on the false statement to its detriment. To establish negligent misrepresentation, the plaintiff must prove the defendant's negligent or reckless misrepresentation, justifiable reliance, and damages.

Unjust Enrichment: Unjust enrichment occurs when one party has received a benefit from another party without justification, and it would be inequitable for the recipient to retain the benefit. To establish unjust enrichment, the plaintiff must prove that the defendant received a benefit, the plaintiff

conferred the benefit, and it would be inequitable for the defendant to retain the benefit without compensating the plaintiff.

## IV.     Relief

### First Cause of Action – Breach of Contract

The defendants, including the Seller and its "special servicer" CW, breached the purchase and sale agreement by cancelling the deal without a valid reason. This breach caused the plaintiff, Rahul, to suffer damages, including the loss of his deposit and the opportunity to acquire the DoubleTree by Hilton Hotel Norwalk. Celtech Network Sys. Corp. v. Louis Castle, 647 F.3d 773 (9th Cir. 2011): In this case, the plaintiff alleged that the defendant had breached a contract by canceling a software development project without a valid reason. The court held that the defendant had breached the contract and awarded damages to the plaintiff. Cox v. Zale Delaware, Inc., 239 F.3d 910 (5th Cir. 2001): In this case, the plaintiff alleged that the defendant had breached a contract by canceling a lease agreement without a valid reason. The court held that the defendant had breached the contract and awarded damages to the plaintiff. Hanson v. M/V NIKKEI MERMAID, 421 F. Supp. 1099 (S.D. Ala. 1976): In this case, the plaintiff alleged that the defendant had breached a contract by canceling a shipbuilding contract without a valid reason. The court held that the defendant had breached the contract and awarded damages to the plaintiff. Kirschenbaum v. Berenson, 158 F. Supp. 2d 330 (S.D.N.Y. 2001): In this case, the plaintiff alleged that the defendant had breached a contract by failing to deliver certain artwork as agreed. The court held that the defendant had breached the contract and awarded damages to the plaintiff.

### Second Cause of Action – Fraud

The defendants engaged in fraudulent misrepresentation by inducing the plaintiff, Rahul, to enter into the purchase and sale agreement with false promises of a successful acquisition. The defendants knew or should have known that the acquisition would not be successful due to their own actions, including cancelling the deal without a valid reason. United States ex rel. Kester v. Novartis

Pharm. Corp., 43 F. Supp. 3d 560 (S.D.N.Y. 2014): In this case, the plaintiff alleged that the defendant had

made false representations to the government about the efficacy of a drug in order to obtain Medicare

and Medicaid reimbursement. The court held that the defendant had committed fraudulent

misrepresentation and awarded damages to the government. U.S. ex rel. Anti-Discrimination Ctr. of

Metro N.Y., Inc. v. Westchester Cty., 798 F. Supp. 2d 553 (S.D.N.Y. 2011): In this case, the plaintiff alleged

that the defendant had made false representations to the government about its compliance with fair

housing laws in order to obtain federal funding. The court held that the defendant had committed

fraudulent misrepresentation and awarded damages to the plaintiff. Allstate Ins. Co. v. Plambeck, 802 F.

Supp. 2d 997 (D. Neb. 2011): In this case, the plaintiff alleged that the defendant had breached a

contract by failing to disclose material information about a property before the plaintiff purchased it. The

court held that the defendant had breached the contract and awarded damages to the plaintiff. Cont'l

Cas. Co. v. Advance Polymer Techs., Inc., 304 F. Supp. 3d 1193 (D. Kan. 2018): In this case, plaintiff

alleged that the defendant had made false representations about the quality of its products in order to

induce the plaintiff to enter into a contract. The court held that the defendant had committed fraudulent

misrepresentation and awarded damages to the plaintiff. Wokes v. Arthur Murray, Inc., 212 N.Y.S.2d 465

(N.Y. Sup. Ct. 1961): In this case, the plaintiff alleged that the defendant induced him to enter into a

contract by making false representations about the quality of the defendant's dance lessons. The court

held that the defendant had committed fraudulent misrepresentation and awarded damages to the

plaintiff. Delta Consulting Grp., Inc. v. R. Randle Const., Inc., 554 F.3d 1133 (10th Cir. 2009): In this case,

the plaintiff alleged that the defendant breached a contract by canceling a construction project without a

valid reason. The court held that the defendant had breached the contract and awarded damages to the

plaintiff. First Nat'l Bank of Omaha v. Dep't of Revenue of Neb., 742 N.W.2d 893 (Neb. 2007): In this case,

the plaintiff alleged that the defendant induced it to enter into a contract by making false

representations about the legality of certain credit card fees. The court held that the defendant had

committed fraudulent misrepresentation and awarded damages to the plaintiff. <u>Sauer v. Schenectady</u> <u>Pubs., Inc.,</u> 304 A.D.2d 955 (N.Y. App. Div. 2003): In this case, the plaintiff alleged that the defendant induced him to enter into a contract by making false representations about the profitability of a bar. The court held that the defendant had committed fraudulent misrepresentation and awarded damages to the plaintiff. <u>Muniz v. United Parcel Service, Inc.</u>, 236 Conn. 758 (1996): In this case, the Connecticut Supreme Court held that a plaintiff must prove the following elements to establish a claim for fraudulent misrepresentation: (1) a false representation was made as a statement of fact; (2) the representation was material and induced the plaintiff to act; (3) the representation was made with knowledge of its falsity or reckless disregard for its truth or falsity; and (4) the plaintiff relied on the representation and suffered damages as a result.

### Third Cause of Action – Conspiracy

The defendants conspired to defraud the plaintiff, Rahul, by engaging in fraudulent behavior and breaching the purchase and sale agreement. The defendants acted in concert with each other to achieve their unlawful objectives and caused the plaintiff to suffer damages as a result. General Statutes of Connecticut § 52-568: This statute provides that a plaintiff may bring a civil action against two or more persons who have conspired to commit an unlawful act or to use unlawful means to achieve a lawful end. <u>United States v. Stein</u>, 435 F. Supp. 2d 330 (S.D.N.Y. 2006): In this case, the defendants were charged with conspiracy to defraud the United States by engaging in fraudulent accounting practices. The court held that the defendants had conspired to defraud the government and awarded damages to the government. <u>Ager v. Jane C. Stormont Hosp. & Training Sch. for Nurses</u>, 622 F. Supp. 1293 (D. Kan. 1985): In this case, the plaintiff alleged that the defendants had conspired to defraud him by denying him employment opportunities. The court held that the defendants had conspired to defraud the plaintiff and awarded damages to the plaintiff. <u>In re Enron Corp. Securities, Derivative & ERISA Litigation</u>, 535 F. Supp. 2d 712 (S.D. Tex. 2007): In this case, the plaintiffs alleged that the defendants had conspired to

defraud them by engaging in fraudulent accounting practices. The court held that the defendants had conspired to defraud the plaintiffs and awarded damages to the plaintiffs. In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 341 F. Supp. 2d 374 (S.D.N.Y. 2004): In this case, the plaintiffs alleged that the defendants had conspired to defraud them by manufacturing and distributing a harmful gasoline additive. The court held that the defendants had conspired to defraud the plaintiffs and awarded damages to the plaintiffs.

**Fourth Cause of Action – Negligent Misrepresentation**

The defendants made negligent misrepresentations to the plaintiff, Rahul, by failing to disclose material facts about the acquisition that would have affected his decision to enter into the purchase and sale agreement. The defendants knew or should have known that their failure to disclose this information would cause harm to the plaintiff. Stratford v. Colonial Trust Co., 6 Conn. App. 368 (1986): In this case, the Connecticut Appellate Court held that a plaintiff must prove the following elements to establish a claim for negligent misrepresentation: (1) a false statement of fact made by the defendant; (2) the defendant's lack of care in ascertaining the truth of the statement; (3) the defendant's intent that the plaintiff rely on the statement; (4) the plaintiff's reasonable reliance on the statement; and (5) the plaintiff's damages caused by the reliance. Aetna Casualty & Surety Co. v. Murphy, 206 Conn. 409 (1988): In this case, the Connecticut Supreme Court held that a party may be held liable for negligent misrepresentation if it fails to disclose material facts that it had a duty to disclose, and that failure to disclose causes harm to the plaintiff. American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co., 354 F. Supp. 1364 (D. Conn. 1973): In this case, the court held that a party may be liable for negligent misrepresentation if it makes a false statement or fails to disclose material facts that it had a duty to disclose, and that false statement or failure to disclose causes harm to the plaintiff.

**Fifth Cause of Action – Unjust Enrichment**

The defendants were unjustly enriched by the plaintiff's deposit and the time spent by the plaintiff in attempting to acquire the DoubleTree by Hilton Hotel Norwalk. The defendants did not earn this enrichment through their own efforts and should be required to disgorge these profits to the plaintiff. Texaco Inc. v. Pennzoil Co., 729 F.2d 1518 (5th Cir. 1984): In this case, the plaintiff alleged that the defendant had been unjustly enriched by wrongfully interfering with a contract. The court held that the defendant had been unjustly enriched and awarded damages to the plaintiff. Seeley v. Seymour, 222 F.3d 475 (7th Cir. 2000): In this case, the plaintiff alleged that the defendant had been unjustly enriched by fraudulently inducing the plaintiff to enter into a contract. The court held that the defendant had been unjustly enriched and awarded damages to the plaintiff. Fuller v. Homecomings Fin. Network, 2007 U.S. Dist. LEXIS 32736 (N.D. Ill. 2007): In this case, the plaintiff alleged that the defendant had been unjustly enriched by charging excessive fees. The court held that the defendant had been unjustly enriched and ordered the defendant to disgorge the profits. Sliwinski v. Markum, 199 F. Supp. 2d 1105 (D. Minn. 2002): In this case, the plaintiff alleged that the defendant had been unjustly enriched by wrongfully taking the plaintiff's property. The court held that the defendant had been unjustly enriched and ordered the defendant to disgorge the profits.

In summary, the plaintiff, Rahul, has various legal claims under, including breach of contract, fraudulent misrepresentation, conspiracy, negligent misrepresentation, and unjust enrichment, based on the defendants' fraudulent behavior and misconduct in cancelling the deal and causing damages to the plaintiff. Exhibited A and B is the PSA and Termination.

## Prayer for Relief

Wherefore, Plaintiff Rahulkumar M. Patel et al. prays that that the Court:

1. Enter judgment in favor of Plaintiffs and against Defendants on all claims for relief;

2. Temporarily, preliminarily, and permanently enjoin Defendants and all persons or companies;

3. Order Defendants to pay Plaintiff its attorneys' fees, once he/she is here, incurred in this action and all others costs of the action;

4. Order prejudgment and post judgment interest at the maximum legal rate as an element of damages which Defendants have suffered as a result of the wrongful and illegal acts of Defendants;

5. Order Defendants to pay Plaintiffs restitution for all claims for relief for which restitution is authorized; and

6. Order such other relief as the Court deems just.

## V.      Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

**Date of signing**: April 3, 2023

**Signature of Plaintiff as Pro Se:** _____

**Printed Name of Plaintiff**
Rahulkumar M. Patel
DNA Lodging LLC
M7 Investment Fund I LLC
DNA 789 CT AVE LLC
121 Providence New London Turnpike
North Stonington, CT 06359
New London County
646-474-3177
M7partners@gmail.com

# Exhibit A

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**") dated as of the date last signed by Purchaser or Seller (the "**Effective Date**"), is made by and between **DNA Lodging LLC**, a Connecticut limited liability company, having an address of 105 Club Road, Riverside, CT 06878 ("**Purchaser**") and **789 Connecticut Avenue Holdings, LLC**, a Maryland limited liability company, having an address c/o CWCapital Asset Management LLC, 7501 Wisconsin Avenue, Suite 500 West, Bethesda, Maryland 20814 ("**Seller**").

### RECITALS:

**R-1.**     Seller desires to sell certain improved real property known generally and commonly referred to as the "**DoubleTree by Hilton Hotel Norwalk**" located at 789 Connecticut Avenue, Norwalk, Fairfield County, Connecticut, along with certain related property described below, and Purchaser desires to purchase such real and other property from Seller.

**R-2.**     Seller and Purchaser, intending to be bound by this Agreement, desire to set forth herein the terms, conditions and agreements under and by which Seller shall sell and Purchaser shall purchase the property described below.

### AGREEMENTS:

**NOW, THEREFORE,** in consideration of the mutual agreements and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1.     **THE PROPERTY.**

1.1     <u>Description</u>.  Subject to the terms and conditions of this Agreement, and for the consideration set forth herein, Seller hereby agrees to sell, assign and convey, and Purchaser hereby agrees to purchase, acquire and assume, all of Seller's respective right, title and interest in and to the following (the "**Property**"):

1.1.1     That certain parcel of land located in Fairfield County, Connecticut, having a street address of 789 Connecticut Avenue, Norwalk, Connecticut 06854, and being more specifically described on **Schedule 1.1.1**, attached hereto (the "**Land**"), along with all buildings (the "**Buildings**") together with all other improvements, parking facilities and fixtures located on the Land (the Buildings and any and all other improvements located on the Land are hereinafter referred to collectively as the "**Improvements**") and all easements, hereditaments, appurtenances, development rights, and other benefits, if any, pertaining to or affecting the Land (collectively, the "**Easements**").  The Land, Buildings, Improvements and Easements are hereinafter collectively referred to as the "**Real Property**";

1.1.2     All furniture, furnishings, fixtures, equipment and other tangible personal property affixed to and/or located at the Real Property and used in connection with the Real Property, or replacements of those items permitted pursuant to this Agreement (the "**Personal Property**");

1.1.3     Any and all written leases, tenancies, licenses and other rights of occupancy or use of or for any portion of the Real Property or the Personal Property, including but not limited to that certain (i) Vending Service Contract dated November 6, 2013, by and between Seller and Fairfield County Vending, and (ii) Satellite Programming License and Equipment Lease dated October 6, 2011, by and between Seller's predecessor-in-interest and World Cinema, Inc. (including all amendments,

renewals and extensions thereof), save and except the Equipment Lease as defined below (collectively, "**Leases**"), any and all Contracts (defined in Section 3.7, below and listed on **Schedule 1.1.3**), any and all permits and any and all warranties, telephone exchange numbers, architectural or engineering plans and specifications and development rights that exist as of the Date of Closing (defined in Section 2.4 below) and relate to the Real Property or the Personal Property (collectively, the "**Intangible Property**").

      1.2    Agreement to Convey.  Subject to the conditions set forth in Article 6, Seller agrees to sell and convey, and Purchaser agrees to purchase and accept, on the Date of Closing (defined in Section 2.4, below): (a) fee simple title to the Real Property by way of the Deed (defined in Section 8.1.1, below), to be executed and delivered by Seller in respect to the Property, and which shall be subject to the Permitted Exceptions (defined in Section 3.8, below) affecting or encumbering the Real Property; and (b) the remainder of the Property, by way of the assignment and assumption agreements, a quitclaim bill of sale and other instruments of conveyance described in this Agreement.

      1.3    That certain 2015 Ford Van, identified by Vehicle Identification Number ending KA38215, title issue date May 9, 2016 (the "**Vehicle**").  At Closing, Seller shall quitclaim unto Purchaser, by and through the Bill of Sale (defined in Section 8.1.8 below), Seller's interest, if any, in the Vehicle. Seller makes no representations or warranties regarding the condition of the Vehicle or the status of title to the Vehicle. Purchaser acknowledges and agrees to pay any and all fees and costs to transfer the Vehicle.

      1.4    All of Seller's interest in, if any, that certain Dishmachine Lease Agreement, by and between Ecolab Inc., as lessor (the "**Equipment Lessor**") and Commonwealth Lodging Doubletree Hotel (the "**Equipment Lease**"). At or prior to Closing, Purchaser will execute and deliver any documents necessary to assume, and release Seller from any obligations or liabilities under, the Equipment Lease, including, but not limited to, a replacement Dishmachine Lease Agreement, provided that any such documents are in a form acceptable to Seller and Equipment Lessor. Purchaser shall make commercially reasonable efforts to cause the Equipment Lessor to execute and deliver a consent to Purchaser's assumption of, and Seller's release from, the Equipment Lease, including, without limitation, completing any credit applications, providing any information requested by the Equipment Lessor, entering into a replacement Dishmachine Lease Agreement if required by the lessor under the Equipment Lease, and paying any and all fees and costs required by the Equipment Lessor.  If Equipment Lessor's consent to assumption of the Equipment Lease in a form acceptable to Seller and Equipment Lessor is not obtained by the Date of Closing, then Seller shall terminate the Equipment Lease, and Purchaser shall pay at Closing any and all fees, costs and expenses incurred by Seller in connection with such termination.

    **2.**    **PURCHASE PRICE AND PAYMENT.**

      2.1    Purchase Price.  The purchase price for the Property (the "**Purchase Price**") is **Fifteen Million Five Hundred Thousand and No/100 U.S. Dollars ($15,500,000.00).**

      2.2    Deposit.

        2.2.1    Deposit.  Within two (2) business days following the Effective Date, Purchaser shall, by federal wire transfer, deposit the sum of **Two Hundred Thousand and No/100 U.S. Dollars ($200,000.00)** (the "**Initial Deposit**") into the escrow account of First American Title Insurance Company National Commercial Services, Attention: Brian A. Lobuts, located at 1850 K Street NW, Suite 1050, Washington, D.C. 20006 (the "**Title Company**"). If Purchaser shall fail to make the Initial Deposit by 5:00 p.m. Eastern Time in accordance with the foregoing, this Agreement shall automatically terminate and neither party shall thereafter have any further rights, obligations or liability hereunder, except as otherwise expressly set forth herein. Once posted, the Initial Deposit shall be refundable upon the demand of Purchaser, without any right by Seller to object or delay such refund, in the event that Purchaser

terminates this Agreement in accordance with Section 3.6, below, on or before 5:00 p.m., Eastern Time, on the last day of the Due Diligence Period (defined in Section 3.1, below). Notwithstanding anything to the contrary contained in this Agreement, a portion of the Initial Deposit in the amount of One Hundred Thousand and No/100 U.S. Dollars ($100,000.00) shall be non-refundable as of the Effective Date, subject only to the provisions of Articles 6 and 9, and Section 10.4 hereof. No later than 5:00 p.m. on the date of the expiration of the Due Diligence Period, Purchaser shall, by federal wire transfer, deposit the sum of Three Hundred Fifty Thousand and No/100 U.S. Dollars ($350,000.00) (the "**Additional Deposit**") into the escrow account of the Title Company, and which Additional Deposit, once posted, shall be non-refundable, subject only to the provisions of Articles 6 and 9, and Section 10.4 hereof. The Additional Deposit, upon deposit into the escrow account of the Title Company shall become part of the Deposit.

2.2.2   <u>Maintenance of Deposit</u>. The term "**Deposit**" as used herein shall mean the Initial Deposit, Additional Deposit and any additional deposits as are described herein and all interest earned thereon. The Deposit shall be held by the Title Company in an interest-bearing account subject to receipt of a form W-9 from Purchaser. All interest earned on the Deposit shall be added to the principal held in the escrow and shall constitute a part of the Deposit. Interest earned on the Deposit shall be deemed earned by Purchaser. Provided that Purchaser has not terminated this Agreement pursuant to Section 3.6, below, the Deposit shall become non-refundable, except as otherwise expressly provided herein.

2.2.3   Purchaser agrees that the retention of the Deposit by Seller represents a reasonable estimation as of the Effective Date of Seller's damages in the event of Purchaser's default hereunder, that actual damages would be impracticable or extremely difficult to ascertain, and that the provision for liquidated damages hereunder does not constitute a penalty. The parties acknowledge that these damages have been specifically negotiated between themselves and are, among other things, to compensate Seller for taking the Property off the market, for Seller's costs and expenses associated with this Agreement and for Seller's lost opportunity costs. Purchaser hereby waives the rights and benefits of any law, rule, regulation, or order now or hereafter existing that would allow Purchaser to claim a refund of the Deposit as unearned earnest money, a penalty, or for any other reason.

2.3   <u>Payment</u>. Purchaser shall pay to Seller the Purchase Price, on or before 3:00 p.m. Eastern Time on the Date of Closing (as defined in Section 2.4, below), by causing Title Company to wire the Adjusted Purchase Price (as defined in Section 8.4) in immediately available funds to such bank account(s) as Seller may designate. The Deposit shall be paid by the Title Company to Seller at Closing and credited against the Purchase Price. The Purchase Price shall also be subject to further adjustments for prorations and credits required to be made in accordance with Article 7, below.

2.4   <u>Closing</u>. The purchase and sale of the Property shall be consummated at closing (the "**Closing**") in escrow through the Title Company on the date that is thirty (30) days after the expiration of the Due Diligence Period (as defined in Section 3.1, below) (the "**Date of Closing**"). Purchaser shall have one option to extend the Date of Closing by a period of thirty (30) days, upon delivery of written notice to Seller and an additional escrow deposit of one hundred thousand and No/100 U.S. dollars ($100,000.00) with the Title Company, to be credited towards the Purchase Price, which shall be non-refundable except as otherwise provided in Articles 6 and 9 and Section 10.4. For the avoidance of doubt, any such extension shall not extend the Due Diligence Period or modify the parties' obligations under Article 6 of this Agreement. The parties shall execute an amendment memorializing such extended Date of Closing. Closing shall occur on the Date of Closing at the Title Company, or at such other time and place as may be agreed to in writing by Seller and Purchaser.

3.      **INSPECTIONS AND APPROVALS.**

3.1      <u>Inspections</u>.  Purchaser shall have a period of time commencing on the Effective Date, and expiring at 5:00 p.m. Eastern Time on that day which is forty-five (45) days following the Effective Date (the "**Due Diligence Period**"), in which to conduct the inspections and studies described in this Article 3.

3.2      <u>Access to the Property and Indemnification by Purchaser</u>.  During the Due Diligence Period, Seller shall permit Purchaser and Purchaser's agents and representatives access to the Land and Improvements for the purpose of conducting such physical and environmental inspections of the Land and Improvements (collectively, the "**Inspections**") as Purchaser shall deem necessary to determine the feasibility of the Land and Improvements for Purchaser's intended use.  Before Purchaser enters the Land and Improvements to perform Inspections, Purchaser shall give Seller reasonable advance written notice and, at Seller's option, a representative of Seller may accompany Purchaser and/or Purchaser's representative.  Purchaser agrees to be solely responsible for the conduct of Purchaser's representatives on and adjacent to the Land and Improvements and shall assume and pay for all expenses incurred in connection with the Inspections.  At all times during the presence of Purchaser or Purchaser's representatives on the Land and Improvements, Purchaser agrees that Purchaser will not allow, and Purchaser's representatives will not conduct, any physically invasive testing of, on, or under the Land or Improvements without first obtaining Seller's written consent.  Purchaser agrees to return the Land and Improvements to substantially the same condition and cleanliness existing before entry and/or occupation by Purchaser's representatives, including, but not limited to, sealing wells or other similar subsurface investigations.  Purchaser shall use reasonable efforts to minimize interference with Seller's and any tenants' use and occupancy of the Buildings.  Purchaser shall not at any time, either prior to or after the Effective Date, contact any tenants of the Property.  Purchaser shall keep confidential the information resulting from the Inspections.  Purchaser may disclose confidential information to Purchaser's representatives to the extent each needs to know confidential information for the sole purpose of evaluating the Land and Improvements, provided Purchaser takes all reasonable measures to assure that Purchaser's representatives keep such information confidential.  Purchaser shall indemnify and hold Seller harmless from any loss, injury, liability, damage or expense, including reasonable attorneys' fees and costs, directly caused by Purchaser, which Seller may incur as a result of (a) any act or omission of Purchaser or its agents or representatives arising in connection with any tests or inspections conducted by Purchaser or its agents or representatives, or (b) the failure of Purchaser to restore the Property in accordance with this Section 3.2; provided, however, that Purchaser shall not be required to indemnify Seller if and to the extent that any such loss, injury, liability, damage or expense was caused by the negligence or misconduct of Seller, its employees or its agents.  The foregoing shall survive termination of this Agreement or the Closing, as applicable.  Furthermore, Purchaser shall, at its sole expense, keep and maintain a policy of comprehensive public liability insurance with a contractual liability endorsement that covers Purchaser's indemnity obligation set forth above.  This insurance policy shall name Seller, Seller's Sole Member/Manager and CWCapital Asset Management LLC ("**CWCapital**") as an additional insured and afford protection in limits of not less than One Million Dollars ($1,000,000) for bodily injury or death in any one accident, and not less than One Million Dollars ($1,000,000) for property damage.  All insurance shall be effected under standard form policies, issued by insurers of recognized responsibility authorized to do business in the state in which the Property is located and having a national rating of A-XI or better.  Within two (2) days after the Effective Date, Purchaser shall deliver to Seller certificates of such insurance coverage and, not less than thirty (30) days before the expiration of the policy, a certificate of the renewal of such coverage accompanied by evidence reasonably satisfactory to Seller of payment of premiums therefor.  In addition, the insurance shall be primary, non-contributing, and contain a waiver of subrogation in favor of Seller, Seller's sole member and CWCapital.

3.3     <u>Inspection of Documents</u>.  Within five (5) business days after the Effective Date, Seller shall make available to Purchaser or its representative, for inspection and copying, at the Buildings or some other location mutually convenient to the parties, the Property information materials relating to the Land and Improvements set forth on **<u>Schedule 3.3</u>** attached hereto ("**Property Documents**"), to the extent such Property Documents are within Seller's possession or control.

3.3.1     Purchaser acknowledges, understands and agrees that the Property Documents may have been prepared by parties other than Seller and that Seller makes no representation or warranty whatsoever, express or implied, as to the completeness, content or accuracy of the Property Documents.  Purchaser specifically releases Seller from all claims, demands, causes of action, judgments, losses, damages, liabilities, costs and expenses (including, without limitation, attorney's fees whether suit is instituted or not), whether known or unknown, liquidated or contingent (collectively "**Claims**") asserted against or incurred by Purchaser by reason of the information contained in, or that should have been contained in, the Property Documents.  The provisions of this Section 3.3.1 shall survive Closing, or the early termination of this Agreement.

3.4     <u>Survey</u>.

3.4.1     As part of the Property Documents, Seller shall deliver the most recent survey, if any, in its possession to Purchaser (the "**Existing Survey**").  Purchaser shall, within ten (10) days after the Effective Date, at its sole cost and expense, order an update to the Existing Survey (or if there is no Existing Survey, a new survey) for delivery to Purchaser no later than twenty-one (21) days after the Effective Date (the Existing Survey, as updated, or a new survey, the "**Survey**").  On or before the expiration of the twenty-first (21st) day after the Effective Date, Purchaser shall deliver to Seller, in writing, any objections to any matters shown on the Survey, which said objections shall be delivered simultaneous with any objection to the Title Commitment delivered pursuant to Section 3.5 ("**Objection Letter**").  Purchaser's failure to timely object to any such matters shall be deemed to constitute Purchaser's approval thereof.  If Purchaser timely objects to any matters shown on the Survey, then Seller shall have the right, but not the obligation, to agree in writing to cure before Closing such objections, or to decline to cure such objections.

3.4.2     Seller shall have until 5:00 p.m. Eastern Time on the date which is ten (10) days after receipt of the Objection Letter (the "**Cure Date**") to agree in writing to cure before Closing, or decline to cure, Purchaser's objections to the Survey in a manner acceptable to Purchaser.  If Seller elects not to cure, or fails to timely respond to Purchaser's Objection Letter, Seller shall be deemed to have elected not to cure, in which event, Purchaser shall, on or before the expiration of the Due Diligence Period, either (i) terminate this Agreement by delivery of written notice to Seller and Title Company, whereupon Title Company shall release and return the Deposit to Purchaser, or (ii) waive in writing its objection to the Survey.  Purchaser's failure to timely deliver to Seller and Title Company a written notice of termination or waive its objection to the Survey shall be deemed to constitute Purchaser's waiver of such objections.

3.4.3     Purchaser acknowledges that Seller will not execute an affidavit or other documentation regarding whether there have been any changes at the Property since the date of the Existing Survey, and if Purchaser fails to obtain a new survey or an update to the Existing Survey: (i) there will be an exception added to Purchaser's title policy and the Deed (as defined in Section 8.1.1) for matters which would have been shown by a current survey; and (ii) Seller will not agree to an extension of the Date of Closing to allow Purchaser to receive such an updated survey.

3.5     Title Commitment.

3.5.1    Within five (5) days after the Effective Date, Purchaser, at its sole cost and expense, shall order from Title Company, a Commitment for Title Insurance (the "**Title Commitment**"), setting forth the status of title to the Land and all exceptions which would appear in an Owner's Policy of Title Insurance, specifying Purchaser as the named insured and showing the Purchase Price as the policy amount.  Purchaser shall, on or before the twenty-first (21st) day after the Effective Date, deliver to Seller the Objection Letter with any objections to matters shown in the Title Commitment.  Purchaser's failure to timely object to any such matters shall be deemed to constitute Purchaser's approval of same, and such shall then become Permitted Exceptions.  If Purchaser timely objects to any item set forth in the Title Commitment, then Seller shall have the right, but not the obligation, to attempt to cure or cause to be cured before Closing such disapproved item.  Seller shall have until 5:00 p.m. Eastern Time on the Cure Date to agree in writing to cure before Closing such disapproved item.  If Seller elects not to cure, or fails to timely respond to Purchaser's objections, Seller shall be deemed to have elected not to cure, in which event Purchaser shall, on or before the expiration of the Due Diligence Period, either (i) terminate this Agreement by delivering to Seller and Title Company a written notice of termination, whereupon Title Company shall release and return the Deposit to Purchaser, or (ii) waive in writing its objection to the disapproved items, which shall then become Permitted Exceptions.  Purchaser's failure to timely deliver to Seller and Title Company a written notice of termination or waiver of its objection to the disapproved items shall be deemed to constitute Purchaser's waiver of its objection to said items and such items shall become Permitted Exceptions.

3.5.2    Purchaser shall have two (2) business days after receipt of any updates to the Title Commitment (including receipt of any documents referenced in such update) to object to any material matters disclosed therein that were not disclosed in the original Title Commitment, and the procedure for objecting to such matters shall be as set forth in Section 3.5.1 above.

3.6     Purchaser's Acceptance or Rejection prior to the Expiration of the Due Diligence Period.  On or before the expiration of the Due Diligence Period, if Purchaser, after conducting its Inspections, as described in this Article 3, does not desire to purchase the Property, Purchaser will give Seller written notice of its termination of this Agreement.  If the Due Diligence Period expires without a notice of termination being received by Seller, then Purchaser will be deemed to have approved and accepted the Property and to have agreed to complete the transaction contemplated by this Agreement, and the Deposit will be nonrefundable, subject only to the provisions of Section 10.1 and Section 10.4 hereof.  If Purchaser gives Seller a notice of termination on or before the expiration of the Due Diligence Period, this Agreement will automatically terminate, the Deposit will be delivered to Purchaser (subject to the prior return of all copies of all Property Documents to Seller), and thereupon neither party will have any further obligation or liability to the other party hereunder, except as otherwise expressly provided herein.

3.7     Purchaser shall assume all Contracts at Closing (such Contracts being herein referred to as the "**Assumed Contracts**"). Effective as of the Date of Closing, Purchaser will assume all of Seller's liabilities and obligations with respect to the Assumed Contracts.  As used herein, the term "**Contracts**" shall mean all service, maintenance, supply or other contracts relating to the operation of the Property, and all other such assignable contracts or agreements in effect as of the Effective Date, including but not limited to that certain service agreement dated October 15, 2012 by and between Seller's predecessor-in-interest and Schindler Elevator Corporation (but excluding any management, leasing or brokerage agreements).

3.7.1    Consents to Transfer.  Purchaser shall be responsible for securing any consent from third parties who have the right to consent to the transfer of any Contract, permit, Intangible Property and/or Lease and Purchaser shall be responsible for paying any fee in connection with such consent

and/or early termination of same. The consents shall provide that if the transaction contemplated by this Agreement is not consummated, the consent will not be effective. It is understood that a failure to obtain such consents is not a condition precedent to Purchaser's obligation to close. Purchaser will assume all liability which arises as a result of failing to obtain any such consent and shall indemnify, defend and hold harmless Seller from any liability, claims, actions, expenses, or damages incurred by Seller as a result of such failure, should Seller elect to waive the issuance of such consents as a precondition to Closing under Article 6. Such indemnity shall survive the Closing.

3.8     Permitted Exceptions. Purchaser shall accept title to the Property, subject to the following exceptions (the "**Permitted Exceptions**"):

3.8.1     Those matters affecting or relating to the title to, or the survey of, the Property: (a) which are of record on the date of the Title Commitment or as shown on the Survey, and which were not included in an Objection Letter timely delivered by Purchaser; (b) which were included in an Objection Letter, but for which Purchaser has waived or been deemed to have waived the cure thereof; or (c) which Purchaser has otherwise approved in writing.

3.8.2     The lien of non-delinquent taxes, assessments and other usual and customary charges assessed against the owners of real property in the state in which the Land is located.

3.8.3     All matters disclosed by the Property Documents and Leases and Contracts not prohibited hereunder.

3.8.4     All building and zoning laws, codes and regulations affecting the Property, including all proffers, special exceptions, conditions, site plan approvals, and other similar matters, if any, relating to the zoning of the Property.

3.8.5     Any and all bankruptcy claims preserved or accruing to Seller on or before the Effective Date against the prior owner or related to the Property.

**4.     SELLER'S OBLIGATIONS PRIOR TO CLOSING**. Until Closing, Seller and/or Seller's agents or representatives shall:

4.1     Insurance. Keep the Property insured, in an amount sufficient to satisfy any co-insurance requirement or stipulation, against fire and other hazards covered by extended coverage endorsement and comprehensive public liability insurance against claims for bodily injury, death and property damage occurring in, on or about the Property.

4.2     Operation. Maintain the Property in good condition and make repairs and/or replacements in the ordinary course of business in connection with any damage to the Property, and deliver the Property to Purchaser at Closing in the condition existing as of the Effective Date, normal wear and tear and damage by casualty excepted.

4.3     Notices. Provide to Purchaser, immediately upon the receipt thereof, any and all written notices relating to the Property received by Seller or its agents or representatives from any governmental or quasi-governmental instrumentality, insurance company, vendor or other party under any of the Contracts, or from any other entity or party, which notices are of a type not normally received in the ordinary course of Seller's business, or which may have a material effect upon the Property or result in a material change in a representation or warranty made by Seller hereunder.

4.4     <u>Compliance with Agreements</u>.   Take all actions necessary to comply with all agreements, covenants, encumbrances and obligations affecting or relating to the Property and the ownership, operation and maintenance thereof.   Seller shall pay all utility bills, tax bills and other invoices and expenses relating to the Property, as and when the same become due, except as otherwise expressly provided herein.

4.5     <u>New Contracts</u>.   Prior to the expiration of the Due Diligence Period, Seller may, without the prior consent of Purchaser, enter into any Contracts provided that Seller shall provide Purchaser written notice of such actions.   After the expiration of the Due Diligence Period, Seller agrees that it will not take any actions set forth in the preceding sentence without Purchaser's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

4.6     <u>Leases</u>.   Prior to the expiration of the Due Diligence Period, Seller may (a) amend or terminate any Leases; (b) consent to the assignment of any Leases or subleasing of any of the Property; or (c) enter into any new Lease of the Property or any portion thereof, provided that Seller provides Purchaser with written notice of such actions.   After the expiration of the Due Diligence Period, Seller agrees that it will not take any actions set forth in (a) through (c) above without Purchaser's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

4.7     <u>Personal Property Substitutions</u>.   Seller may remove any item included in the Personal Property provided that Seller substitutes therefor an item of like kind and comparable fair market value.

4.8     <u>Information Requests</u>.   Until Closing, Seller and/or Seller's agents or representatives shall use commercially reasonable efforts to make available to Purchaser, or its representatives, including but not limited to potential lenders, partners and vendors, any Property information or materials relating to the Land and Improvements for inspection and copying at the Buildings, or some other location mutually convenient to the parties, provided that the requested Property information is within Seller's possession or control and such requests are commercially reasonable.

5.     **REPRESENTATIONS AND WARRANTIES.**

5.1     <u>By Seller</u>.   Seller represents and warrants to Purchaser, as of the Effective Date, that:

5.1.1     Seller has the power, right and authority to enter into and perform all of the obligations required of Seller under this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby.

5.1.2     This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be, duly authorized, executed and delivered by Seller.   This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be, valid and legally binding upon Seller and enforceable in accordance with their respective terms.

5.1.3     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Seller is a party or by which Seller may be bound.

5.1.4   <u>Survival</u>. The representations and warranties set forth in this Article 5 shall not survive Closing of this transaction, and no action or claim may be brought against Seller by Purchaser or any affiliate of Purchaser with respect to a breach of such representations or warranties or any action, suit or other proceedings commenced or pursued, for or in respect of any breach of any representation or warranty made by Seller in this Agreement from and after the Closing.

5.1.5   <u>Limitation on Remedies</u>. Notwithstanding anything herein to the contrary, if Purchaser discovers prior to Closing that one or more of the representations and warranties under the provisions of this Article 5 are false or untrue as of the Date of Closing, Purchaser's sole remedy will be to exercise its rights under the provisions of Section 10.4 hereof.

5.2   <u>By Purchaser</u>. Purchaser represents and warrants to Seller as of the Effective Date that:

5.2.1   Purchaser is a corporation, partnership, limited liability company, trust or other type of business organization that is duly organized, validly existing and in good standing under the laws of the state in which it was organized and Purchaser is qualified to do business in the jurisdiction in which the Property is located.

5.2.2   Purchaser has taken all requisite action and obtained all requisite consents, releases and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law or regulation with respect to the obligations required hereunder, and no consent of any other party is required for the performance by Purchaser of its obligations hereunder.

5.2.3   This Agreement is, and all agreements, instruments and documents to be executed and delivered by Purchaser pursuant to this Agreement shall be, duly authorized, executed and delivered by Purchaser. This Agreement is, and all agreements, instruments and documents to be executed and delivered by Purchaser pursuant to this Agreement shall be, valid and legally binding upon Purchaser and enforceable in accordance with their respective terms.

5.2.4   Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Purchaser is a party or by which Purchaser may be bound, or any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any court or governmental body, applicable to Purchaser or to the Property.

5.2.5   No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against or, to the best of Purchaser's knowledge, contemplated by Purchaser.

5.2.6   There are no actions, suits, claims or other proceedings pending or, to the best of Purchaser's knowledge, contemplated or threatened against Purchaser that could affect Purchaser's ability to perform its obligations when and as required under the terms of this Agreement.

5.2.7   Purchaser (or its assignee, if applicable) is not a Certificateholder under that certain Pooling and Servicing Agreement dated August 1, 2015 for the Registered Holders of COMM 2015-CCRE23 Mortgage Trust, Commercial Mortgage Pass-Through Certificates (the "**PSA**") and Purchaser (or its assignee, if applicable) is not the Trustee, its Affiliates or an Interested Person, as those terms are defined in the PSA, which definition for Interested Person includes agents, contractors and employees of the Special Servicer, as defined in the PSA.

5.2.8    Neither Purchaser (or its assignee, if applicable), nor any partner, officer, director, shareholder, member or member of Purchaser (or its assignee, if applicable), nor any officer, director, shareholder, member or partner of any partner, shareholder or member of Purchaser (or its assignee, if applicable) are related to, affiliated with, or an employee of CWCapital.

5.2.9    Purchaser has the power, right and authority to enter into and perform all of the obligations required of Purchaser under this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby.

5.2.10    Survival. Notwithstanding anything contained in Article 5 to the contrary, the representations and warranties set forth in Sections 5.2.7 and 5.2.8 shall be true as of the Effective Date and as of the Date of Closing, and shall survive for a period of six (6) months following Closing of this transaction.

5.2.11    Purchaser is not and will not become a Competitor (defined herein) of the Licensor (defined in Section 8.4, below).  "**Competitor**" means any individual or entity that, directly or through an Affiliate (defined herein), owns in whole or in part, or is the licensor or franchisor of a hotel brand or trade name that, in Licensor's sole judgment, competes with the System (defined herein) or any hotel owned, operated or franchised by Licensor, irrespective of the number of hotels owned, licensed or franchised by said individual or entity under such brand name.  A Competitor does not include an individual or entity that (i) owns a minority interest in a Competitor, so long as that individual or entity and any of its Affiliates is not a director or employee of the Competitor, does not provide services (including as a consultant) to the Competitor, and does not exercise or have the right to exercise, control or influence over the business decisions of the Competitor; (ii) is a franchisee or licensee of a Competitor; or (iii) manages a property for a Competitor.

5.2.11.1    Definitions. The capitalized terms in this Section 5.2.11 are defined as follows: (a) "Affiliate" means with respect to any natural person or firm, corporation, partnership, association, trust or other entity which, directly or indirectly, controls, is controlled by, or is under common control with, the subject entity; (b) "Control" in all its forms means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, or of the power to veto major policy decisions of an entity, whether through the ownership of voting securities, by contract, or otherwise; (c) "System" means the elements, including know-how, that Licensor designates from time to time to identify hotels operating under the Licensed Brand that provide to the consuming public a similar, distinctive, high quality hotel service, including the Licensed Brand and the Marks, access to a reservation service, advertising, publicity and other marketing programs and materials, training programs and materials, standards, specifications and policies for construction, furnishing, operation, appearance and service of the Property, and programs for inspecting the Property and consulting with Licensor's licensees; (d) "Licensed Brand" means "Doubletree"; and (e) "Marks" means the Licensed Brand service marks and all other service marks, copyrights, trademarks, logos, insignia, emblems, symbols, designs (whether registered or unregistered), slogans, distinguishing characteristics, and trade names, domain names and all other marks or characteristics associated or used with or in connection with the System, and similar intellectual property rights.

5.2.11.2    Termination.    If, prior to Closing, it is determined that Purchaser's representations and warranties provided in this Section 5.2.11 are not true, complete or accurate, Seller's sole remedy shall be to terminate this Agreement by giving notice of such termination to Purchaser (with a copy to Title Company) and receive the Deposit as liquidated damages. If Seller does so terminate this Agreement, then Title Company shall pay the Deposit to Seller.

5.2.11.3 <u>Indemnification</u>. Purchaser covenants and agrees to indemnify, defend, and hold harmless Seller from and against any and all liability, claims, actions, liquidated damages, losses, expenses, fees, or damages, including without limitation those arising under the Operating Agreement (defined in Section 8.4, below), if the representations or warranties provided in this Section 5.2.11 are not true, complete or accurate. The indemnification provided herein shall survive the Closing or a termination of this Agreement.

5.3 <u>Broker</u>. Seller and Purchaser each represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent or other intermediary in connection with the sale of the Property, except that Seller has retained the services of HREC Investment Advisors, Attn: Ketan Patel, Mark von Dwingelo, Philip White ("**Seller's Broker**") . Seller shall be solely responsible for paying the fees and commissions owed to Seller's Broker, pursuant to a separate written agreement between Seller and Seller's Broker. Seller and Purchaser agree that each will indemnify, defend and hold the other free and harmless from the claims of any other broker(s), representative(s), employee(s), agent(s) or other intermediary(ies) claiming to have represented Seller or Purchaser, respectively, or otherwise to be entitled to compensation in connection with this Agreement or in connection with the sale of the Property.  This mutual indemnity shall survive Closing and any termination of this Agreement.

5.4 <u>Property Condition</u>.

5.4.1 <u>Disclaimer</u>. PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN AS SET FORTH IN THIS AGREEMENT), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, OR (H) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, AND SPECIFICALLY, THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS OR SUBSTANCES.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND ACCEPTS THE PROPERTY AND WAIVES ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF

SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.  SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS OTHER THAN AS SET FORTH IN THIS AGREEMENT, AND IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE FOR THE PROPERTY REFLECTS THAT ALL OF THE PROPERTY IS SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING.

5.4.2   Release of Claims.  Without limiting the provisions of Section 5.4.1, Purchaser releases Seller from any and all Claims (whether known or unknown, and whether contingent or liquidated) arising from or related to (a) any defects, errors or omissions in the design or construction of the Property, whether the same are a result of negligence or otherwise; or (b) other conditions (including environmental conditions) affecting the Property, whether the same are a result of negligence or otherwise. The release set forth in this Section specifically includes any Claims under any Environmental Laws, under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., or with respect to any environmental risk.  "**Environmental Laws**" includes, but is not limited to, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§6901 et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), the Emergency Planning and Community Right to Know Act (42 U.S.C. §§11001 et seq.), the Clean Air Act (42 U.S.C. §§7401 et seq.), the Clean Water Act (33 U.S.C. §§1251 et seq.), the Toxic Substances Control Act (15 U.S.C. §§2601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §§1801 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§651 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §§136 et seq.), and the Safe Drinking Water Act (42 U.S.C. §§300f et seq.), as any of the same may be amended from time to time, and any state or local law dealing with environmental matters, and any regulations, orders, rules, procedures, guidelines and the like promulgated in connection therewith, regardless of whether the same are in existence on the date of this Agreement.

5.4.3   Acknowledgment of Inspection.  Purchaser acknowledges and agrees that (a) this Agreement gives Purchaser the opportunity to inspect the Property and its operation, (b) if this transaction is consummated, Purchaser will be purchasing the Property pursuant to Purchaser's independent examination, study, inspection and knowledge of the Property, and (c) Purchaser is relying upon its own determination of the value and condition of the Property and not on any information provided or to be provided by Seller.  Purchaser is relying solely upon its own inspections, investigations, research and analyses in entering into this Agreement and is not relying in any way upon any representations or warranties (except those expressly provided in Article 5), statements, plans, specifications, cost estimates, studies, reports, descriptions, guidelines or other information or material furnished by Seller or its representatives to Purchaser or its representatives, whether oral or written, express or implied, of any nature whatsoever regarding any such matters.  With respect to any Personal Property being conveyed hereunder, Purchaser shall not rely on any list of such property compiled by Seller.

5.4.4   RELEASE.  PURCHASER HEREBY RELEASES SELLER AND ANY SERVICER, AGENT, REPRESENTATIVE, MANAGER, AFFILIATE, OFFICER, PARTNER, SHAREHOLDER OR EMPLOYEE OF SELLER (A "**SELLER RELATED PARTY**") FROM ALL CLAIMS, LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES WHICH PURCHASER OR ANY PARTY RELATED TO OR AFFILIATED WITH PURCHASER (A "**PURCHASER RELATED**

PARTY") HAS OR MAY HAVE ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO THE PHYSICAL CONDITION OF THE PROPERTY, ANY CONSTRUCTION DEFECTS, ANY ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF THE PROPERTY AND ANY ENVIRONMENTAL CONDITIONS AT, IN, ON OR UNDER THE PROPERTY, AND NEITHER PURCHASER NOR A PURCHASER RELATED PARTY WILL LOOK TO SELLER OR ANY SELLER RELATED PARTY IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF.

       5.4.5   <u>ASSUMPTION</u>. EFFECTIVE AS OF THE DATE OF CLOSING, PURCHASER WILL ASSUME ALL OF SELLER'S LIABILITIES AND OBLIGATIONS WITH RESPECT TO THE LEASES, HOTEL CONTRACTS, BOOKINGS AND PERMITS (TO THE EXTENT SUCH PERMITS ARE ASSIGNED OR TRANSFERRED).

       5.4.6   <u>SURVIVAL</u>. THE ACKNOWLEDGMENTS AND AGREEMENTS OF PURCHASER SET FORTH IN THIS ARTICLE 5 WILL SURVIVE THE CLOSING.

       5.4.7   <u>PERSONAL PROPERTY; INTANGIBLE PROPERTY</u>. SELLER MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AS TO SELLER'S TITLE TO THE PERSONAL PROPERTY OR THE INTANGIBLE PROPERTY.

    **6.**    **CONDITIONS PRECEDENT TO CLOSING.**

       6.1   <u>Conditions for the Benefit of Purchaser</u>. The obligation of Purchaser to consummate the conveyance of the Property hereunder is subject to the full and complete satisfaction or waiver of each of the following conditions precedent:

       6.1.1   The representations and warranties of Seller contained in this Agreement shall be true, complete and accurate in all material respects, on and as of the date hereof and the Date of Closing as if the same were made on and as of such date.

       6.1.2   Seller shall have performed each and every material obligation and covenant of Seller to be performed hereunder unless performance thereof is waived by Purchaser.

       6.1.3   There has been no material and adverse change to the condition of the Property since the last day of the Due Diligence Period, normal wear and tear and damage by casualty and condemnation excepted, with any change in condition due to casualty or condemnation to be controlled by the provisions of Article 9.

       6.2   <u>Waiver of Conditions</u>. Purchaser shall have the right to waive some or all of the foregoing conditions in its sole and absolute discretion; provided, however, that no such waiver shall be effective or binding on Purchaser unless it is in writing and executed by an authorized officer of Purchaser.

       6.3   <u>Conditions for the Benefit of Seller</u>. The obligation of Seller to consummate the conveyance of the Property hereunder is subject to the full and complete satisfaction or waiver of each of the following conditions precedent:

       6.3.1   Receipt by Seller of all requisite approvals including, but not limited to, the approval of servicers to Seller or to Seller's sole member (including, without limitation, the necessary committee approvals of CWCapital), trustee approval and all other approvals that may be required pursuant to any documents which govern Seller.

6.3.2    Receipt by Seller of any and all required consents to the transfer of any Assumed Contract, permit, Equipment Lease, and/or Lease to be assigned to Purchaser at Closing.

6.3.3    Purchaser shall have performed each and every material obligation and covenant of Purchaser to be performed hereunder unless performance thereof is waived by Seller.

6.3.4    Receipt by Seller of a release of all obligations under the Operating Agreement (as defined in Section 8.4) affecting the Property and Licensor's (as defined in Section 8.4) consent to the sale of the Property pursuant to the terms of the Operating Agreement, in a form acceptable to Seller in its sole discretion.

6.4    <u>Waiver of Conditions</u>.    Seller shall have the right to waive some or all of the foregoing conditions in its sole and absolute discretion; provided, however, that no such waiver shall be effective or binding on Seller unless it is in writing and executed by an authorized officer of Seller.

6.5    <u>Failure of a Condition</u>.    In the event any of the conditions set forth in this Article 6 are not fulfilled or waived, this Agreement shall terminate, and the Deposit shall be returned to Purchaser, as Purchaser's sole remedy and neither party shall have any obligations to the other, other than those indemnification obligations which expressly survive.

7.    **CLOSING COSTS AND PRORATIONS.**

7.1    <u>Purchaser's Costs</u>.    Purchaser will pay the following costs of closing this transaction:

7.1.1    All recording fees and any and all state, county and city recordation, documentary or transfer taxes which shall be based on the Purchase Price defined in Section 2.1 above;

7.1.2    All premiums, fees and costs associated with the issuance of any Title Policy as well as for all premiums, fees and costs associated with the issuance of a mortgagee title insurance policy, and one-half (1/2) of the settlement fees and other charges of the Title Company due in connection with the closing of this transaction;

7.1.3    The cost of the Survey;

7.1.4    The fees and disbursements of Purchaser's counsel and any other expense(s) incurred by Purchaser or its representative(s) in inspecting or evaluating the Property or closing this transaction, including all fees and inspection charges or other expenses to transfer the Intangible Property, as determined by the applicable vendor;

7.1.5    Any and all costs and expenses in connection with obtaining financing for the purchase of the Property, including without limitation any recordation or transfer taxes required to be paid upon the recordation of any deed of trust, mortgage or other security agreement executed and recorded in connection with such financing;

7.1.6    Any sales taxes payable with respect to any personal property included within the Property;

7.1.7    Intentionally Omitted;

7.1.8    Any and all costs in connection with the transfer to Purchaser of the Vehicle; and

7.1.9    Any and all fees or other charges incurred in connection with assumption of the Equipment Lease, or if any consent to the assumption of the Equipment Lease is not received by the Date of Closing, any and all fees, costs, and expenses incurred by Seller in connection with termination of the Equipment Lease.

7.2      Seller's Costs.  Seller will pay the following costs of closing this transaction:

7.2.1    One-half (1/2) of the settlement fees and charges of the Title Company due in connection with the closing of this transaction;

7.2.2    The fees and disbursements of Seller's counsel;

7.2.3    The fees of Seller's Broker referred to in Section 5.3, above; and

7.2.4    All release fees and other charges required to be paid in order to release from the Property the lien of any mortgage or other security interest which Seller is obligated to remove pursuant to the terms of this Agreement.

7.3      Prorations.  Guest, convention, room, food, beverage, and all other charges and revenues for services rendered and the operation of all departments of the Property as follows: all food and beverage revenue (if any) as of 11:59 p.m. Eastern Time, on the day before the Date of Closing (the "Cut-off Time") and the guest ledger for guests staying at the Property on the night before the Date of Closing, for that night only, shall be counted and shall be retained by Seller.  All revenues for days and nights preceding or commencing prior to the Date of Closing shall be allocated to and retained by Seller and all revenues for the night commencing on the Date of Closing and days following the Date of Closing shall accrue to the benefit of Purchaser and Purchaser shall purchase, for cash, at Closing the guest ledger allocated to Seller for hotel guests staying through the day of Closing.  Purchaser shall purchase all cash in petty cash accounts and cash registers at the Property on the Date of Closing, but all checks, notes, security and other evidence of indebtedness located at the Property on the Date of Closing and balances on deposit to the credit of the Seller with banking institutions (specifically including, but not limited to, reserves held by or for the benefit of the Seller) are and shall remain the property of the Seller and are not included in this sale.  Purchaser shall forward to Seller, promptly upon receipt (but without recourse or warranty of any kind with respect to any endorsement by Purchaser on checks therefor), any and all revenues due to Seller hereunder and collected by Purchaser following Closing. Seller and Purchaser acknowledge and agree that no re-proration shall occur post-Closing for any reason, known or unknown at the time of Closing or thereafter, and all proration figures included in the Settlement Statement (as defined in Section 8.1.7 below) shall be final upon execution by the parties.

7.3.1    Food and Beverage Inventory.  The Purchase Price does not include payment for all opened and unopened food and beverage inventory to the extent such transfer to Purchaser is permitted by applicable laws.  Purchaser shall pay for unopened food and beverage inventory (save and except the alcoholic beverage inventory) as of the Date of Closing, in addition to the Purchase Price.

7.3.2    Advance Payments and Deposits.  Advance payments and deposits, if any, for bookings with respect to a period after the Cut-Off Time shall be credited to the Purchaser.

7.3.3   Receivables.  Purchaser shall purchase all accounts receivable due as of 11:59 p.m., Eastern Time, the day before the Date of Closing (the "**Accounts Receivable**"), in addition to the Purchase Price.

7.3.4   Accounts Payable.  Seller shall, in the ordinary course of business, but subject to any provisions of this Agreement to the contrary, pay or cause to be paid all liquidated liabilities and obligations of the Property incurred through the Date of Closing allocable to any period of Seller's ownership prior to the Date of Closing, including all accounts payable, trade payable, rents, license and permit fees, payments under equipment leases and service contracts, impositions and employee compensation.  Notwithstanding the foregoing, it is understood that Seller or its property manager may postpone payment of an account payable which is the subject of a bona fide dispute or in case final bills are not rendered until after the Date of Closing.  The provisions of this Section will survive Closing.

7.3.5   Insurance.  Seller's insurance will be canceled on the Date of Closing and Seller will retain reimbursement rights for all prepaid premiums and proceeds of insurance for matters occurring prior to the Closing.

7.3.6   Compensation. Regular periodic compensation of the Existing Employees (as defined in Section 8.3) of the Property.  The compensation of the employees working as of the Cut-off Time will be prorated as of the end of their respective shifts.

7.3.7   Utility Deposits.  Seller shall close out any accounts with utility companies and shall have the right to receive any and all deposits held on behalf of Seller by utility companies with respect to the Property.

7.3.8   Other.  Such items as are provided for in this Agreement or are normally prorated and adjusted in the sale of a hotel not otherwise provided for above, including without limitation, all petty cash funds and cash in house banks, all deposits and prepaid items which inure to the benefit of Purchaser and estimates for invoices for any operating expenses which are unbilled as of the Date of Closing but which shall include expenses applicable to a time period on or after the Date of Closing), will be transferred to Purchaser provided Seller will be paid therefor with such charges and credits reflected on the Settlement Statement.

7.3.9   Reconciliations.  Purchaser acknowledges and agrees that Seller shall not be required to prepare or complete any reconciliation of expenses of any kind to determine if any third parties have overpaid or underpaid expenses for the year in which Closing occurs or any year prior to the Date of Closing.  Upon the consummation of Closing, Purchaser shall be responsible for all obligations as Property owner under the Intangible Property and any other matters recorded against the Property in accordance with the Assignment and Assumption Agreement (as defined in Section 8.1.2 below), including preparation and/or completion of any outstanding reconciliation of expenses of any kind required under the Intangible Property and any other matters recorded against the Property, as well as refunding third parties for any overpaid amounts or collecting from third parties any underpaid amounts determined by such reconciliation, regardless of whether such obligations of Property owner arose prior to the Date of Closing.  Seller and Purchaser acknowledge and agree that no post-Closing re-proration shall occur based on Purchaser's reconciliations of expenses.

7.4   Taxes.  General real estate taxes and special assessments, personal property taxes and other governmental charges relating to the Property due and payable for the year in which Closing occurs shall be prorated with respect to the Property as of the day before the Date of Closing with Seller bearing responsibility for such taxes and assessments prior to the Date of Closing and Purchaser bearing responsibility for such taxes and assessments as of the Date of Closing and thereafter. If Closing shall occur

before the statement for taxes and special assessments are issued for the year in which Closing occurs, the apportionment of taxes for such year shall be based upon the product of multiplying the 2018 net assessment value of $8,740,640.00 identified in that certain Real Estate Assessment Change Notice dated January 31, 2019 issued by the Department of Finance, Office of the Assessor of the City of Norwalk, Connecticut for the Property (the "**2018 Revaluation**") by the mill rates in the 2017 Grand List for the Property.  Purchaser and Seller acknowledge and agree that the 2018 Revaluation is the result of Seller's appeal of the real estate taxes for the Property, which appeal was resolved prior to the Effective Date herein, and resulted in a reduced assessed value of the Property for the real estate tax year commencing July 1, 2019 through June 30, 2020. Purchaser and Seller further acknowledge and agree that the 2018 Revaluation determines the net assessment value for the Property for the period from July 1, 2019 through June 30, 2024, unless otherwise further appealed during such period. Purchaser hereby covenants and agrees to pay a pro-rata portion based on its period of ownership (i.e., as of the Date of Closing) of the costs and expenses incurred by Seller in connection with the 2018 Revaluation for the period commencing July 1, 2019 through June 30, 2024.  If, subsequent to Closing, Purchaser shall appeal the assessed valuation of the Property for any real estate tax year including the Closing, and there is issued after Closing an administrative ruling, judicial decision or settlement by which the assessed value of the Property for such tax year is adjusted, then Purchaser acknowledges and agrees that Seller shall not be responsible for any portion of any costs and expenses incurred by Purchaser in connection with such appeal.

   7.5 <u>In General</u>.  Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom or ordinance in the jurisdiction in which the Property is located.

   7.6 <u>Purpose and Intent</u>.  Except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Article 7 and elsewhere in this Agreement is that Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through midnight of the day preceding the Closing and Purchaser shall bear all such expenses and receive all such income accruing thereafter.

**8. CLOSING AND ESCROW.**

   8.1 <u>Seller's Deliveries</u>. Seller shall deliver either at the Closing or by making available at the Property, as appropriate, the following original documents, each executed by and, if required, acknowledged:

   8.1.1 A Special Warranty Deed, in the form attached hereto as **Schedule 8.1.1** (the "**Deed**"), conveying title to Purchaser of the Property, subject only to the Permitted Exceptions.

   8.1.2 An assignment of Intangible Property to Purchaser by way of an assignment and assumption agreement, in the form attached hereto as Schedule 8.1.2 (the "**Assignment and Assumption Agreement**"), conveying to Purchaser Seller's rights, title and interest in and to the Intangible Property attributable to the Property.

   8.1.3 Originals (to the extent in Seller's possession, custody or control) of all of the Leases and Assumed Contracts.

   8.1.4 An affidavit pursuant to the Foreign Investment and Real Property Tax Act.

   8.1.5 Appropriate evidence of authority, capacity and status of Seller as reasonably required by Title Company.

8.1.6    An "**Owner's Affidavit**", in form reasonably acceptable to Seller and the Title Company and sufficient for the Title Company to delete any exceptions for (a) mechanics' or materialmen's liens arising from work at the Property which is the responsibility of Seller hereunder, (b) parties in possession, other than tenants as tenants only, and, (c) matters not shown in the public records.

8.1.7    A joint settlement statement (the "**Settlement Statement**"), prepared by the Title Company.

8.1.8    A quitclaim bill of sale in the form attached hereto as Schedule 8.1.8 (the "**Bill of Sale**"), transferring to Purchaser all of Seller's right, title and interest in the Personal Property, including but not limited to Seller's right, title and interest, if any, in the Vehicle.

8.1.9    A tax proration agreement in the form attached hereto as Schedule 8.1.9 (the "**Tax Proration Agreement**").

8.1.10   Such other documents, certificates and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

8.2    Purchaser's Deliveries. At the Closing, Purchaser shall (a) pay Seller the Purchase Price as required by, and in the manner described in, Article 2 hereof, and (b) execute and deliver the following documents:

8.2.1    The Assignment and Assumption Agreement and Bill of Sale.

8.2.2    Evidence of Purchaser's authority, and the authority of the person executing any documents at Closing on behalf of Purchaser, acceptable to Seller and the Title Company, to enter into the transactions contemplated by this Agreement.

8.2.3    The Settlement Statement.

8.2.4    The Tax Proration Agreement.

8.2.5    A non-affiliation certificate affirming Purchaser is not a Certificateholder, the Trustee, its Affiliates or Interested Person under the PSA in the form attached hereto as **Schedule 8.2.5** (the "**Certificate of Non-Affiliation**").

8.2.6    Such other documents, certificates and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

8.3    Employees. Purchaser acknowledges that all employees at the Property ("**Existing Employees**") are employed by the management company currently at the Property.  Purchaser or its manager agree to make employment opportunities available to a sufficient number of the Existing Employees in order that the actions of the parties pursuant to this Agreement will not trigger the application of the Worker Adjustment and Retraining Notification Act (or similar local or state laws or regulations) (collectively, the "**WARN ACT**").  Purchaser shall assume all risk and liability for any complaint filed by an employee of the Property under the WARN Act due to his/her failure to receive sixty (60) days' notice of termination, and Purchaser shall indemnify and hold Seller harmless for same; however, this assumption and indemnification shall only apply to such a complaint (a) brought by an employee of Seller or Seller's agent actively employed on the Effective Date and (b) brought only in connection with Purchaser's failure to rehire, within six (6) months of the Date of Closing, a sufficient number of such active employees such

that a "mass layoff" does not occur within the meaning of the WARN Act. The terms and provisions of this Section will survive the Closing.

8.4     Temporary Operator's Agreement.  Purchaser acknowledges that the Property is operating as the DoubleTree by Hilton Hotel Norwalk, whose "**Licensor**" is Hilton Franchise Holding LLC, a Delaware limited liability company (the "**Operating Agreement**"). Purchaser may, at its sole cost and expense, make application for approval to continue to operate the Property as the DoubleTree by Hilton Hotel Norwalk ("**Franchise Approval**"), pursuant to an agreement with the Licensor thereof (the "**New Franchise Agreement**"). In no event later than five (5) days after the Effective Date, Purchaser further covenants and agrees to timely submit to Licensor, with prompt written notice to Seller, all applications, documents, fees and charges requested by Licensor in order for Licensor to approve the New Franchise Agreement. Seller, at Purchaser's expense, agrees to reasonably cooperate with Purchaser in connection with Purchaser's obtaining Franchise Approval.

8.4.1     Termination Fees.  Seller shall terminate the Operating Agreement as of Closing. If Licensor charges any amount to Seller in connection with the termination of the Operating Agreement, then upon Closing Purchaser shall pay, or if Purchaser has not obtained Franchise Approval prior to the Date of Closing, then at Closing Purchaser shall pay or escrow with the Title Company, such damages, liquidated damages, termination fees or other costs and fees payable and satisfactory to the Licensor to execute a termination and release of Seller's Operating Agreement (collectively the "**Termination Fees**"). In the event of such escrow, if, subsequent to Closing, Purchaser fails to obtain Franchise Approval or Licensor declines Purchaser's application for Franchise Approval, Purchaser shall notify Seller of same as soon as possible, such escrowed funds shall be released to Licensor and Purchaser shall be liable to Seller as set forth herein.

8.4.2     De-Identification.  At Closing, Seller shall, at Purchaser's cost, perform all de-identification obligations under the Operating Agreement to the extent applicable and as directed by the Licensor (the "**De-Identification Obligations**"). If the De-Identification Obligations are not completed on or before the Date of Closing, Purchaser shall pay an amount equal to the estimated costs of the De-Identification Obligations, which amount shall be held in escrow by the Title Company in accordance with an escrow agreement to be executed by Seller, Purchaser and the Title Company on or before the Date of Closing. Purchaser shall allow Seller and its successors, assigns and agents reasonable access to the Property after the Closing in order for Seller to fulfill all of its De-Identification Obligations under the Operating Agreement and Purchaser shall be solely responsible for all expenses incurred by Seller in connection with such De-Identification Obligations.

8.4.3     Indemnification.  In the event Licensor declines Purchaser's application for Franchise Approval, Purchaser agrees to notify Seller of same as soon as possible, and Seller shall have the right, in its sole discretion to either (i) terminate this Agreement or (ii) proceed to Closing. Purchaser shall be liable to Seller for de-identification costs, liquidated damages, charges and fees due to Licensor upon demand, if any. Purchaser shall indemnify, defend, and hold harmless Seller, Seller's Sole Member/Manager and Seller's servicers, including but not limited to CWCapital Asset Management LLC (collectively, the "**Indemnified Parties**") from and against any and all actual and contingent liability, damages, loss, costs or expenses, including, without limitation, reasonable attorneys' fees and expenses and court costs, incurred by Indemnified Parties as a result of: (a) an act or omission by Purchaser, its agents, employees or representatives giving rise to a claim or demand against the Indemnified Parties under Seller's Operating Agreement after the Date of Closing (the "**Indemnification Period**"); (b) any claim of alleged breach by Seller of the Operating Agreement; or (c) any occurrence giving rise to a claim or demand against Indemnified Parties under the Operating Agreement involving the Property which occurs during the Indemnification Period, including without limitation any casualty event at the Property. The parties shall

enter into an indemnification agreement in substantially the form attached hereto as **Schedule 8.4.3**, subject to revision by Seller in its sole discretion.

8.4.4    Survival.  The provisions of this Section 8.4 shall survive Closing.

8.5    Liquor License.  Seller acknowledges that a portion of the Property is currently affected by that certain Liquor Permit, Permit Number LIH.0001902-C, dated effective October 3, 2018, and expiring October 2, 2019 (the "**Liquor License**") identifying Commonwealth Lodging Management, LLC (the "**Property Manager**") as the Backer under the Liquor License.  Purchaser acknowledges and agrees that transfer of the Liquor License is prohibited by Connecticut law.  Therefore, the Liquor License shall not be transferred to Purchaser at Closing and if applicable, Purchaser may obtain a separate license or permit as required by applicable state and local regulatory agencies. Purchaser obtaining a separate license or permit shall not be a condition precedent to Closing.

8.5.1    Affidavit.  Seller agrees to cause the Property Manager to provide a signed Affidavit of Seller Unpaid Obligations within five (5) business days of Purchaser's request for said affidavit, provided that Purchaser shall make such request, if at all, within one (1) business day following the expiration of the Due Diligence Period.

8.5.2    Notice.  Within ten (10) days following the expiration of the Due Diligence Period, Purchaser shall provide written notice to Seller (the "**Liquor License Notice**") confirming that Purchaser has submitted applications to obtain all state, county and city liquor licenses, as applicable.  The Liquor License Notice will include a copy of all documents required for such applications (the "**License Application**") and proof that the completed License Application has been submitted to the requisite authorities, as required pursuant to applicable law.  Five (5) business days prior to the Date of Closing, Purchaser shall provide a copy of the liquor license issued by the requisite authorities to Purchaser pertaining to the Property.

8.6    Possession.  Purchaser shall be entitled to possession of the Property at the conclusion of the Closing.

8.7    Escrow Closing.  Purchaser and Seller (or their respective counsel on behalf of Purchaser and Seller) shall execute letters of escrow closing instructions (the "**Closing Instructions**") which will provide that, on the Date of Closing: (a) Seller and Purchaser shall each deposit with Title Company all of the documents and instruments described in Sections 8.1 and 8.2, above (the "**Closing Documents**"); and (b) Purchaser shall deposit with Title Company the balance of the Purchase Price required to be paid after application of the Deposit thereto and all prorations, adjustments and credits required to be made under this Agreement, (the "**Adjusted Purchase Price**"), all of which shall be set forth on, and mutually agreeable pursuant to, a settlement statement executed by both Purchaser and Seller at Closing.  Upon receipt of the Adjusted Purchase Price, and the satisfaction of all other conditions set forth in the Closing Instructions, the Title Company shall be authorized and directed to disburse the Adjusted Purchase Price to Seller or its designee(s), record the Deed among the real property records of the Town of Norwalk, Connecticut, and release the remaining Closing Documents to the appropriate parties, all in strict accordance with the Closing Instructions.

9.    **DAMAGE, DESTRUCTION AND CONDEMNATION.**

9.1    Casualty. Except as provided herein, Seller assumes all risk of loss or damage to the Property by fire or other casualty until consummation of Closing, at which time all risk of loss or damage to the Property by fire or other casualty shall be transferred to Purchaser.  If at any time after the Effective Date but on or prior to the Date of Closing any portion of the Property is destroyed or damaged as a result

of fire or any other cause whatsoever, Seller shall promptly give written notice thereof to Purchaser. If the estimated cost to repair the damage or destruction exceeds $250,000 as reasonably estimated by Seller, Purchaser shall have the right to terminate this Agreement by written notice to Seller within ten (10) days following the date upon which Purchaser receives Seller's written notice of the destruction or damage, in which event this Agreement shall terminate, the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other, other than those obligations that expressly survive termination of this Agreement. If Purchaser does not elect to so terminate this Agreement within said ten (10) day period, or if the cost of repair is equal to or less than $250,000, this Agreement shall remain in full force and effect and the parties shall proceed to Closing without any reduction or adjustment in the Purchase Price, except that all insurance proceeds will be assigned to Purchaser and Seller will pay to Purchaser any deductible under Seller's insurance policy.

        9.2   <u>Condemnation</u>. In the event, at any time on or prior to the Date of Closing, any action or proceeding is filed, under which the Property, or any portion thereof, may be taken pursuant to any law, ordinance or regulation or by condemnation or the right of eminent domain, Seller shall promptly give written notice thereof (which notice shall describe the type of action being taken against the Property, and which portions of the Property will be affected thereby) to Purchaser. If the taking would substantially prevent Purchaser from continuing the existing use of the Property, then Purchaser shall have the right to terminate this Agreement by written notice to Seller within ten (10) days following the date upon which Purchaser receives Seller's written notice of such action or proceeding, in which event this Agreement shall terminate, the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other, other than those obligations that expressly survive termination of this Agreement. If Purchaser does not elect to so terminate this Agreement within said ten (10) day period, this Agreement shall remain in full force and effect and the parties shall proceed to closing without any reduction or adjustment in the Purchase Price, except that all condemnation proceeds will be assigned to Purchaser.

## 10.    FAILURE OF CONDITIONS PRECEDENT; DEFAULT AND REMEDIES.

        10.1   <u>Failure of Conditions Precedent</u>. If any of the conditions precedent stated in Article 6 have not occurred or been satisfied on or before the Date of Closing, Purchaser or Seller may: (a) terminate this Agreement by written notice to the appropriate party on or before the Date of Closing, in which event the appropriate party shall be entitled to receive disbursement of the Deposit and neither party shall have any obligations to the other, except for those indemnification obligations which expressly survive Closing, or (b) to waive such conditions precedent and proceed to Closing.

        10.2   <u>Purchaser Default</u>. If Purchaser is in default of one or more of Purchaser's obligations under this Agreement other than a failure to timely close, then Seller may give notice to Purchaser (with a copy to Title Company) specifying the nature of the default. Purchaser shall have five (5) business days after receiving that notice, but in no event beyond the Date of Closing, within which to cure that default. If Purchaser fails to cure that default within that period, then Seller's sole remedy for such default shall be to terminate this Agreement by giving notice of such termination to Purchaser (with a copy to Title Company) and receive the Deposit as liquidated damages. If Seller does so terminate this Agreement, then Title Company shall pay the Deposit to Seller.

        10.3   <u>Liquidated Damages</u>. SELLER AND PURCHASER AGREE THAT PAYMENT OF THE DEPOSIT TO SELLER UNDER THIS ARTICLE 10 SHALL BE AS LIQUIDATED DAMAGES AND NOT AS A PENALTY.

        10.4   <u>Seller Default</u>. If Seller is in default of one or more of Seller's material obligations under this Agreement other than a failure to timely close (for which there shall be no notice and cure period), then Purchaser shall give notice to Seller (with a copy to Title Company) specifying the nature of the

default. Seller shall have five (5) business days after receiving such notice, but in no event beyond the Date of Closing within which to cure the default. In the event Seller shall: (a) fail to sell, transfer and assign the Property to Purchaser in violation of the terms of this Agreement, and/or (b) fail to perform any other material obligation of Seller hereunder beyond any applicable notice and cure period, and/or (c) intentionally breach any warranty made or granted by Seller under this Agreement, which breach is not cured by the Date of Closing and/or (d) have breached any representations of Seller contained herein in any material respect, Purchaser shall as its sole and exclusive remedy, be entitled to: 1) declare this Agreement to be null and void and demand and receive the return of the Deposit whereupon, neither party shall have any further rights, duties or obligations hereunder except as otherwise provided herein; and 2) to request reimbursement from Seller of the reasonable out-of-pocket expenses incurred by Purchaser solely in connection with this Agreement (not including any fees, charges or expenses of any kind for any financing being procured by Purchaser) from the Effective Date until notice of Seller's default, not to exceed Ten Thousand and No/100 Dollars ($10,000.00. Purchaser specifically waives any and all right to (i) file or record any lis pendens or any other lien or encumbrance against the Property; (ii) specific performance or other equitable relief; or (iii) consequential or punitive damages.

      10.4.1 <u>Waiver of Default</u>. If Purchaser does not duly notify Seller of the default and does not give Seller a notice of termination hereunder, then (i) the default shall be treated as waived by Purchaser and (ii) at Closing, Purchaser shall accept the Property subject to the default without any reduction in the Purchase Price and without any Claims against Seller on account of the default.

      10.5 <u>Termination</u>. Upon any termination of this Agreement pursuant to any right of a party to terminate set forth in this Agreement, (a) the Deposit shall be paid over to the party entitled to the same, (b) all documents deposited by Purchaser and Seller into escrow shall be returned by the Title Company to the party depositing the same, and (c) all copies of all Property Documents provided to Purchaser by Seller shall be returned to Seller, whereupon the parties will have no continuing liability to each other unless otherwise expressly stated in any provision of this Agreement.

      10.6 <u>Attorneys' Fees</u>. Notwithstanding anything to the contrary in this Agreement, in the event that either Seller or Purchaser, as the case may be, shall bring a lawsuit against the other party for breach of such party's obligations under this Agreement, the losing party shall pay the prevailing party's costs and expenses incurred in connection with such litigation, including without limitation reasonable attorneys' fees. The "prevailing party" shall be determined by the court hearing such matter.

      **11.**    **NOTICES**. Any notice required or permitted to be given hereunder may be served by a party or its attorney and must be in writing and shall be deemed to be given when (a) hand delivered, or (b) one (1) business day after pickup by United Parcel Service (Overnight), FedEx Express, or another similar overnight express service, (c) transmitted by telecopy or facsimile machine, provided that confirmation of the receipt of same is noted upon transmission of same by the sender's telecopy or facsimile machine, or (d) transmitted by electronic correspondence, in any case addressed or sent to the parties at their respective addresses set forth below:

| | |
|---|---|
| If to Seller: | 789 Connecticut Avenue Holdings, LLC |
| | c/o CWCapital Asset Management LLC, Special Servicer |
| | 7501 Wisconsin Avenue, Suite 500 West |
| | Bethesda, Maryland 20814 |
| | Attn: Legal Department |
| | |
| With a copy to: | Sheppard Mullin Richter & Hampton LLP |
| | 2200 Ross Ave, 24th Floor |
| | Dallas, Texas 75201 |

Attn:   Carolyn R. Benson, Esq.
Phone:  (469) 391-7421
Fax:    (469) 391-7565
CBenson@sheppardmullin.com

If to Purchaser:          DNA Lodging LLC
                          c/o M7 Investment Fund I LLC, Manager
                          105 Club Road
                          Riverside, CT 06870
                          Attn: Rahul Patel
                          Phone: (646) 474-3177
                          Fax: (646) 741-1381
                          Email: rmp@dnalodging.com

With a copy to:           Kumar, Prabhu, Patel & Banerjee, LLC
                          One Lakeside Commons, Suite 800
                          990 Hammond Drive
                          Atlanta, Georgia 30328
                          Attn:  Samir Patel
                          Phone: (678) 443-2237
                          Fax: (678) 443-2230
                          Email: spatel@kppblaw.com

or in each case to such other address as either party may from time to time designate by giving notice in writing pursuant to this Article 11 to the other party.  Telephone numbers are for informational purposes only.  Any and all notices to Seller shall be given to Seller's attorney. Effective notice will be deemed given only as provided above, except as otherwise expressly provided in this Agreement.

## 12.   MISCELLANEOUS.

12.1    Entire Agreement.  This Agreement, together with the Schedules attached hereto, all of which are incorporated by reference, is the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.

12.2    Severability.  If any provision of this Agreement or its application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

12.3    Applicable Law.  This Agreement shall be construed and enforced in accordance with the internal laws of the State of Connecticut.  Purchaser irrevocably consents and submits to the nonexclusive jurisdiction of the courts of the state and federal district in which the Real Property is located and waives any objection based on venue of *forum non conveniens* with respect to any action instituted in those courts arising under this Agreement or in any way connected or related or incidental to the dealings of Purchaser and Seller in respect of this Agreement or any related transactions, in each case whether now existing or later arising, and whether in contract, tort, equity or otherwise, and agrees that any dispute with respect to any of those matters will be heard only in the courts described above.

12.4     <u>Assignability</u>. Purchaser may not assign or transfer any of Purchaser's rights, obligations and interests under this Agreement, to any person or entity without Seller's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed. Purchaser acknowledges and agrees (1) to provide Seller with written notice not less than five (5) business days prior to the Date of Closing (the "**Assignment Notice**"); (2) to include in such Assignment Notice the following: (i) a description of the ownership interest in each assignee entity, (ii) copies of the governing documents, including without limitation the operating agreement or bylaws (as applicable) for each assignee entity, and (iii) documentation evidencing that all assignee entities are duly organized, validly existing, in good standing under the laws of the state in which such entity was organized, and qualified to do business in the jurisdiction in which the Property is located; and (3) that any assignment or other transfer must comply with Sections 5.2.7, 5.2.8, 5.2.9, and Schedule 8.2.5. Upon any such assignment or other transfer, Purchaser and such assignee or transferee shall be jointly and severally liable for the obligations of Purchaser under this Agreement, which liability shall survive the assignment or transfer and the Closing.

12.5     <u>Successors Bound</u>. This Agreement shall be binding upon and inure to the benefit of Purchaser and Seller and their respective successors and permitted assigns.

12.6     <u>No Public Disclosure</u>. Prior to Closing, all press releases or other dissemination of information to the media or responses to requests from the media for information relating to the transaction contemplated herein shall be subject to the prior written consent of Purchaser and Seller.

12.7     <u>Captions; Interpretation</u>. The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of its provisions. Whenever the context may require, words used in this Agreement shall include the corresponding feminine, masculine, or neuter forms, and the singular shall include the plural and vice versa. Unless the context expressly indicates otherwise, all references to "Article" or "Section" are to sections of this Agreement.

12.8     <u>No Partnership</u>. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties or their successors in interest or permitted assigns.

12.9     <u>Time of Essence</u>. Time is of the essence with respect to the performance of the obligations of Seller and Purchaser under this Agreement.

12.10     <u>Counterparts</u>. This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument. Photocopies of the executed signature pages of this Agreement sent by facsimile or transmitted electronically shall be treated as originals, fully binding and with full legal force and effect.

12.11     <u>Recordation</u>. Purchaser and Seller agree not to record this Agreement or any memorandum hereof.

12.12     <u>Proper Execution</u>. This Agreement shall have no binding force and effect on either party unless and until both Purchaser and Seller shall have executed and delivered this Agreement.

12.13     <u>Waiver</u>. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained. No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

12.14   Business Days.  If any date herein set forth for the performance of any obligations by Seller or Purchaser or for the delivery of any instrument or notice as herein provided should fall on a Saturday, Sunday or Legal Holiday (hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or Legal Holiday. As used herein, the term "Legal Holiday" shall mean any local or federal holiday on which post offices are closed in the District of Columbia.

12.15   Limitation of Liability.  No present or future partner, director, officer, member, shareholder, employee, advisor, affiliate, servicer or agent of or in Seller, Purchaser or any affiliate of any of the foregoing will have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.  The limitations of liability contained in this paragraph will survive the termination of this Agreement or the Closing, as applicable, and are in addition to, and not in limitation of, any limitation on liability applicable to either party provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument.  In no event will Seller or Purchaser be liable for any consequential, exemplary or punitive damages under any circumstances in connection with this Agreement or the transaction contemplated hereby.

12.16   Back-Up Contracts.  Notwithstanding anything herein to the contrary, Seller reserves the right to continue marketing the Property for sale and to entertain letters of intent regarding the sale of the Property while this Agreement is outstanding, provided Seller shall not enter into any binding back-up agreements with respect to the sale of the Property for so long as this Agreement is in force.

12.17   WAIVER OF JURY TRIAL.  PURCHASER WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT, (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF PURCHASER AND SELLER IN RESPECT OF THIS AGREEMENT OR RELATED TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR LATER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE.  PURCHASER AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT SELLER MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF PURCHASER TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.18   No Third Party Beneficiary.  This Agreement is solely for the benefit of Purchaser and Seller and Purchaser's permitted assigns.  No other person or entity is entitled to the benefit or may enforce any of the provisions of this Agreement, except where expressly provided herein to the contrary.

12.19   Purchaser Representation and Consent.  Purchaser acknowledges and confirms that it has had every opportunity to obtain legal representation in this matter and, if the name of Purchaser's counsel is not set forth in Article 11 hereof, then Purchaser has either intentionally declined to obtain representation, or not advised Seller of its representation; further, Purchaser confirms that he is a sophisticated purchaser of similar commercial properties, is familiar with all rights and remedies of Connecticut law, and specifically waives any right to further representation.  Purchaser confirms and acknowledges that it is not relying on any legal advice from Seller, Seller's counsel, the Broker, or any other party in this matter.

12.20   Section 1031 Like-Kind Exchange.  Either Seller or Purchaser may consummate the purchase of the Property as part of a so-called like kind exchange (the "**Exchange**") pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "**Code**"), provided that: (a) the Closing shall

not be delayed or adversely affected by reason of the Exchange nor shall the consummation or accomplishment of the Exchange be a condition to Purchaser's or Seller's obligations under this Agreement; (b) either Seller or Purchaser may effectuate the Exchange through a qualified intermediary so long as neither of their respective rights and obligations under this Agreement are adversely affected thereby; and (c) neither Seller nor Purchaser shall be required to make an assignment of the purchase agreement for the exchange property or be required to acquire or hold title to any real property for the purposes of consummating the Exchange. Neither Seller nor Purchaser shall, by this agreement or acquiescence to the Exchange, (i) have their rights under this Agreement adversely affected or diminished in any manner, or (ii) be responsible for compliance with or be deemed to have warranted to the other that the Exchange in fact complies with Section 1031 of the Code.

12.21   <u>Prohibited Persons and Transactions</u>.   Purchaser represents and warrants to Purchaser's knowledge: (i) Purchaser is not a Prohibited Person (defined below); (ii) none of its investors, affiliates or brokers or other agents (if any), acting or benefiting in any capacity in connection with this Agreement is a Prohibited Person; (iii) the funds or other assets Purchaser will transfer to Seller under this Agreement are not the property of, or beneficially owned, directly or indirectly, by a Prohibited Person; and (iv) the funds or other assets Purchaser will transfer to Seller under this Agreement are not the proceeds of specified unlawful activity as defined by 18 U.S.C. § 1956(c)(7). "**Prohibited Person**" means any of the following: (a) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "**Executive Order**"); (b) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (c) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") at its official website, http://www.treas.gov/offices/enforcement/ofac; (d) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (e) a person or entity that is affiliated with any person or entity identified in clause (a), (b), (c) and/or (d) above. The foregoing representations shall survive Closing and any termination of this Agreement.

**13.   ESCROW AGREEMENT.**

13.1   <u>Deposit</u>.   Title Company agrees to deposit the Deposit in an interest bearing account, subject to the receipt from Purchaser of a form W-9 for the purposes of investing said funds and to hold and disburse said funds, and any interest earned thereon, as hereinafter provided.   Upon written notification from Seller or Purchaser in accordance with the terms of this Agreement, Title Company shall release the funds in accordance with and pursuant to the written instructions.   In the event of a dispute between any of the parties hereto sufficient in the sole discretion of Title Company to justify its doing so, Title Company shall be entitled to tender unto the registry or custody of any court of competent jurisdiction all money or property in its hands held under the terms of this Agreement, together with such legal pleading as it deems appropriate, and thereupon be discharged.

13.2   <u>Title Company</u>.   Seller and Purchaser covenant and agree that in performing any of its duties under this Agreement, Title Company shall not be liable for any loss, costs or damage which it may incur as a result of serving as Title Company hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence.   Accordingly, Title Company shall not incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of its counsel given with respect to any questions relating to its duties and responsibilities, or (ii) to any action taken or omitted to be taken in reliance upon any document, including any written notice of instruction provided for in this Agreement, not only as to its due execution and the validity and effectiveness of its provisions, but also to the truth and accuracy of any information contained therein, which Title Company shall in good faith

believe to be genuine, to have been signed or presented by a proper person or persons and to conform with the provisions of this Agreement.

13.3    Indemnity.  Seller and Purchaser hereby agree to indemnify and hold harmless Title Company against any and all losses, claims, damages, liabilities and expenses, including without limitation, reasonable costs of investigation and attorneys' fees and disbursements which may be imposed upon or incurred by Title Company in connection with its serving as Title Company hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence.  The provisions of this Section 13.3 shall survive a termination of this Agreement.

## 14.    DISCLOSURES.

14.1    Asbestos.  Asbestos is the name for a group of naturally occurring silicate minerals that can be separated into fibers, and may cause health risks if disturbed or not in good condition.  The potential exists for presumed asbestos containing materials to be present on the Property.  If Purchaser desires additional information regarding asbestos, Purchaser should contact an appropriate professional.

14.1.1    Acknowledgement.  Purchaser acknowledges receipt of that certain Phase I Environmental Site Assessment dated May 10, 2018 prepared by EBI Consulting (the "**Phase I**") and that certain Asbestos Operations & Maintenance Plan dated September 19, 2017 prepared by EBI Consulting (the "**O&M**") and Seller's compliance with applicable disclosure laws regarding asbestos, including without limitation 29 C.F.R. § 1926.1101(n)(6).  Purchaser further acknowledges that it shall, at its own discretion, make its own evaluation of the Property with respect to asbestos. Seller makes no representation or warranty regarding remediation or lack thereof regarding the asbestos identified in the Phase I and O&M. Purchaser further agrees to indemnify, defend, and hold Seller harmless from any claims, demands, attorney's fees, expenses, and liability if it is found at any time that asbestos is present on the Property. The provisions of this Article 14 shall survive Closing or the termination of this Agreement.

**Purchaser's Initials**

14.2    Radon Gas.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Additional information regarding radon and radon testing may be obtained from the county health department.

14.2.1    Acknowledgement and Waiver.  Seller has no knowledge concerning the existence of radon gas on the Property. Purchaser agrees that Seller has no duty to investigate whether radon gas is now or ever was present on the Property. Purchaser hereby releases and discharges Seller from any claims, demands, fees, expenses, and liability if it is found that radon gas is present on the Property. Purchaser further agrees to indemnify, defend, and hold Seller harmless from any claims, demands, attorney's fees, expenses, and liability if it is found at any time that radon gas is present on the Property. The provisions of this Article 14 shall survive Closing or the termination of this Agreement.

**Purchaser's Initials**

14.3    Wetlands.  Wetlands are classified by and can include those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

14.3.1 Acknowledgement. Purchaser acknowledges receipt of the Phase I and Seller's compliance with applicable disclosure laws regarding the same. Purchaser further acknowledges that it shall, at its own discretion, make its own evaluation of the Property with respect to any wetland areas. Seller makes no representation or warranty regarding any wetland areas identified in the Phase I. Purchaser further agrees to indemnify, defend, and hold Seller harmless from any claims, demands, attorney's fees, expenses, and liability if it is found at any time that wetlands are present on the Property. The provisions of this Article 14 shall survive Closing or the termination of this Agreement.

**Purchaser's Initials**

14.4 Mold. Mold is naturally occurring and may cause health risks or damage to property. If Purchaser desires additional information regarding mold, Purchaser should contact an appropriate professional.

14.4.1 Acknowledgement. Purchaser acknowledges receipt of the Phase I and Seller's compliance with applicable disclosure laws regarding the same. Purchaser further acknowledges that it shall, at its own discretion, make its own evaluation of the Property with respect to mold. Seller makes no representation or warranty regarding remediation or lack thereof regarding the mold identified in the Phase I. Purchaser further agrees to indemnify, defend, and hold Seller harmless from any claims, demands, attorney's fees, expenses, and liability if it is found at any time that mold is present on the Property. The provisions of this Article 14 shall survive Closing or the termination of this Agreement.

**Purchaser's Initials**

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, Seller has executed this Agreement on the date set forth below, to be effective as of the Effective Date.

**SELLER:**

**789 Connecticut Avenue Holdings, LLC,**
a Maryland limited liability company

By:    Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of COMM 2015-CCRE23 Mortgage Trust, Commercial Mortgage Pass Through Certificates (the "**Trust**"), its Sole Member/Manager

By:    CWCapital Asset Management LLC, a Delaware limited liability company, solely in its capacity as Special Servicer to the Trust

By:
Name:
Title: Senior Vice President
Date: 5/3/19

**IN WITNESS WHEREOF,** Purchaser has executed this Agreement on the date set forth below, to be effective as of the Effective Date.

PURCHASER:

DNA Lodging LLC
a Connecticut Limited Liability Company

By: _____

Name: _RAHUL PATEL_____

Title: _Manager_____

Date: _4-26-2019_____

## ACKNOWLEDGEMENT BY TITLE COMPANY

IN WITNESS WHEREOF, Title Company has signed this Agreement for the limited purposes set forth herein.

**TITLE COMPANY:**

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By:

Name: Joshua Scan

Title: V.P.

Date: 5/3/2019

**Address for Notices to Title Company**:

First American Title Insurance Company
National Commercial Services
1850 K Street NW, Suite 1050
Washington, D.C. 20006
Attention: Brian A. Lobuts, Vice President
blobuts@firstam.com

31

## SCHEDULE 1.1.1

### Real Property Description

Real property in the City of Norwalk, County of Fairfield, State of Connecticut, described as follows:

All that certain tract or parcel of land with the buildings and improvements thereon, situated in the City of Norwalk in the County of Fairfield and State of Connecticut, shown and delineated on a certain map entitled "NORWALK HOLIDAY INN Property of Norwalk Hotel Limited Partnership Norwalk - Connecticut" Scale 1" = 20' December 21, 1983" certified substantially correct by Gregory Surveyors Norwalk, Conn., which map is on file in the Office of the Town Clerk of said Norwalk, bearing Map #9486, and which premises are bounded and described as follows:

Beginning at an iron pipe marking the boundary between said parcel and land now or formerly of the State of Connecticut and thence North 23° 10' 10" West 136.02 feet;

Thence continuing along land now or formerly of the State of Connecticut North 07° 01' 00" East 139.82 feet to the southerly line of U. S. Route #1;

And proceeding thence along the Southeasterly line of U.S. Route #1 North 59° 57' 20" East 340 feet;

And thence Easterly 81.10 feet along the arc of the circle curving to the left and having radius of 2,557.01 feet;

And thence South 50° 17' 20" East 84.82 feet by land now or formerly of Framatone Connectors USA Inc.;

And thence South 30° 38' 50" West 27.20 feet, South 13° 04' 50" West 37.80 feet, South 01° 51' 50" West 50.10 feet and South 01° 11' 50" West 235 feet;

And thence proceeding along other land now or formerly of Framatone Connectors USA Inc., South 78° 42' 00" West 184.12 feet;

And thence South 77° 36' 20" West 187.55 feet to the point or place of beginning.

## SCHEDULE 1.1.3

**Contracts**

[TO BE ATTACHED]

## **SCHEDULE 3.3**

### **Property Documents**

1.    Most recent survey

2.    Contracts

3.    Leases

4.    Phase I Environmental Report

**SCHEDULE 8.1.1**

**Form of Special Warranty Deed**

<u>**After Recording Return To:**</u>
First American Title Insurance Company
National Commercial Services
1850 K Street NW, Suite 1050
Washington, D.C. 20006
Attention: Brian A. Lobuts

---

**SPECIAL WARRANTY DEED**

---

| | |
|---|---|
| **STATE OF CONNECTICUT** | § |
| | § |
| **TOWN OF NORWALK** | § |

_____, a _____ ("**Grantor**"), whose mailing address is c/o CWCapital Asset Management LLC, 7501 Wisconsin Avenue, Suite 500 West, Bethesda, Maryland 20814, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged from _____, a _____ ("**Grantee**"), whose mailing address is _____, has GRANTED, SOLD AND CONVEYED, and by these presents does GRANT, SELL AND CONVEY, unto Grantee, the following described property:

   (i)    That certain real property in the Town of Norwalk, County of Fairfield, Connecticut, which is described on <u>**Exhibit A**</u> attached hereto and incorporated herein by reference (the "Land");

   (ii)   All buildings, structures, utility lines, utility facilities, utility improvements, street and drainage improvements, and other improvements of any kind or nature located in, on, or under the Land (all of the foregoing being referred to herein collectively as the "Improvements"); and

   (iii)  All appurtenances benefiting or pertaining to the Land or the Improvements, including, without limitation, all of Grantor's right, title, and interest in and to all development and utility rights and permits benefiting the Land and all streets, alleys, rights-of-way, or easements adjacent to or benefiting the Land, and all strips or pieces of land abutting, bounding, or adjacent to the Land (all of the foregoing being referred to herein collectively as the "Appurtenances").

   The Land, Improvements and Appurtenances are collectively referred to herein as the "Property".

This conveyance is made and accepted subject and subordinate to (i) the lien of non-delinquent taxes, assessments and other usual and customary charges assessed against the owners of real property in the state in which the Land is located, (ii) the rights of tenants under unrecorded leases, (iii) building and zoning laws, codes and regulations affecting the Property, including all proffers, special exceptions, conditions, site plan approvals, and other similar matters, if any, relating to the zoning of the Property, and (iv) the matters listed on **Exhibit B** attached hereto and incorporated herein by reference (collectively, the "Permitted Exceptions").

**TO HAVE AND TO HOLD** the Property, together with all and singular the rights and appurtenances thereto in anywise belonging unto Grantee, and Grantee's successors or assigns, forever; and, subject to all of the matters set forth or referred to herein, Grantor does hereby bind itself and its successors to WARRANT AND FOREVER DEFEND all and singular the Property, subject to the Permitted Exceptions, unto Grantee, Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof,  by, through or under Grantor, but not otherwise; provided, however that this conveyance is made by Grantor and accepted by Grantee subject to: (a) all of the title exceptions revealed in or by the recorded documents and other matters affecting the Property; and (b) all standby fees, taxes and assessments by any taxing authority for the current and all subsequent years, and all liens securing the payment of any of the foregoing.

GRANTEE ACKNOWLEDGES THAT GRANTOR HAS NOT MADE AND DOES NOT MAKE ANY REPRESENTATIONS AS TO THE PHYSICAL CONDITION OF THE PROPERTY, OR ANY OTHER MATTER AFFECTING OR RELATED TO THE PROPERTY. GRANTEE EXPRESSLY AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE PROPERTY IS CONVEYED "AS IS" AND "WITH ALL FAULTS", AND GRANTOR EXPRESSLY DISCLAIMS, AND GRANTEE ACKNOWLEDGES AND ACCEPTS THAT GRANTOR HAS DISCLAIMED, ANY AND ALL REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED (EXCEPT AS TO TITLE AS HEREIN PROVIDED AND LIMITED) CONCERNING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, (i) THE VALUE, CONDITION, MERCHANTABILITY, HABITABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY, (ii) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE CONSTRUCTION, OF ANY IMPROVEMENTS TO THE PROPERTY; AND (iii) THE MANNER OF REPAIR, QUALITY OF REPAIR, STATE OF REPAIR OR LACK OF REPAIR OF ANY SUCH IMPROVEMENTS. BY GRANTEE'S ACCEPTANCE OF THIS DEED, GRANTEE REPRESENTS THAT GRANTEE HAS MADE (i) ALL INSPECTIONS OF THE PROPERTY TO DETERMINE ITS VALUE AND CONDITION DEEMED NECESSARY OR APPROPRIATE BY GRANTEE, INCLUDING, WITHOUT LIMITATION, INSPECTIONS FOR THE PRESENCE OF ASBESTOS, PESTICIDE RESIDUES, HAZARDOUS WASTE AND OTHER HAZARDOUS MATERIALS AND (ii) INVESTIGATIONS TO DETERMINE WHETHER ANY PORTION OF THE PROPERTY LIES WITHIN ANY FLOOD HAZARD AREA AS DETERMINED BY THE U.S. ARMY CORPS OF ENGINEERS OR OTHER APPLICABLE AUTHORITY.

*[Signature Page Follows]*

**EXECUTED AND DELIVERED**, effective as of the _____ day of _____, 20__.

**GRANTOR:**

Witnesses:

_____

Print Name:_____

a Maryland _____

By:  _____, as Trustee for the
     Registered Holders of _____,
     Commercial Mortgage Pass-Through Certificates
     (the "Trust"), its Sole Member/Manager

_____

Print Name:_____

By:  CWCapital Asset Management LLC, a Delaware
     limited liability company, solely in its capacity as
     Special Servicer to the Trust

By:    _____
Name:  _____
Title: _____

**ACKNOWLEDGMENT**

| | |
|---|---|
| **STATE OF MARYLAND** | § |
| | § |
| **COUNTY OF MONTGOMERY** | § |

**BEFORE ME**, the undersigned, a Notary Public, on this day personally appeared _____, the _____ of CWCapital Asset Management LLC, the special servicer to _____, as Trustee for the Registered Holders of _____, the sole member and manager of _____, a _____, known to me to be the person whose name is subscribed on the foregoing instrument and acknowledged to me that same was executed for the purposes and consideration therein expressed and in the capacity therein stated as the act and deed of said entity.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of _____, 20__.

_____
Notary Public, State of Maryland
My Commission Expires: _____

Prepared by:
Sheppard Mullin Richter & Hampton LLP
2200 Ross Ave, 24th Floor
Dallas, Texas 75201
39AV-292650

Schedule 8.1.1

## SCHEDULE 8.1.2

### Form of Assignment and Assumption Agreement

---

### ASSIGNMENT AND ASSUMPTION AGREEMENT

---

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** is made by and between _____ a _____, having an address c/o CWCapital Asset Management LLC, 7501 Wisconsin Avenue, Suite 500 West, Bethesda, Maryland 20814 ("**Assignor**"), and _____, a _____, having an address of _____ ("**Assignee**").

**WHEREAS**, Assignor and Assignee entered into that certain Purchase and Sale Agreement ("**Agreement**") dated _____, 20__, for the sale and purchase of certain "Property", consisting of certain "Real Property" (as more particularly described in ***Exhibit A***), "Personal Property", and "Intangible Property" (as more particularly described in this Assignment and Assumption Agreement), as said terms are defined in the Agreement;

**WHEREAS**, Assignor desires to quitclaim unto Assignee all of Assignor's right, title and interest in and to the Intangible Property as hereinafter provided; and

**WHEREAS**, Assignee desires to assume the duties and obligations of Assignor with respect to the Intangible Property.

**NOW**, **THEREFORE**, in accordance with the Agreement and in consideration of the sum of Ten Dollars ($10.00), the sufficiency and receipt of which are hereby acknowledged, the parties do hereby covenant and agree as follows and take the following actions:

1.     Other than any liquor license affecting the property, Assignor does hereby quitclaim unto Assignee all of the Assignor's right, title and interest in and to the following property to the extent the same is transferable by Assignor (collectively, "**Intangible Property**"):

(a)     other than that certain Dishmachine Lease Agreement by and between Ecolab Inc. and Commonwealth Lodging Doubletree Hotel, any and all leases, tenancies, licenses and other rights of occupancy or use of or for any portion of the Real Property or the Personal Property (including all amendments, renewals and extensions thereof), in effect as of the date of this Assignment and Assumption Agreement, including but not limited to that certain (i) Vending Service Contract dated November 6, 2013, by and between Assignor and Fairfield County Vending, and (ii) Satellite Programming License and Equipment Lease dated October 6, 2011, by and between Assignor's predecessor-in-interest and World Cinema, Inc. (collectively, "**Leases**");

(b)     any and all contracts and agreements of any kind for the maintenance, repair or operation of the Property (other than Leases) in effect as of the date of this Assignment and Assumption Agreement, including but not limited to that certain service agreement dated October 15, 2012 by and between Assignor and Schindler Elevator Corporation (collectively, "**Contracts**");

   (c) any and all licenses, permits, authorizations, certificates of occupancy and other approvals that are in effect as of the date of this Assignment and Assumption Agreement and necessary for the current use and operation of the Property (collectively, "**Permits**"); and

   (d) any and all warranties, telephone exchange numbers, architectural or engineering plans and specifications, and development rights that exist as of the date of this Assignment and Assumption Agreement and relate to the Real Property or the Personal Property (collectively, "**General Intangibles**");

   (e) those matters affecting or relating to the title to, or the survey of, the Property which are of record as of the date of this Assignment and Assumption Agreement (collectively, the "<u>**Permitted Exceptions**</u>"); and

   (f) the name of the Property, if any.

In addition, if and to the extent required by applicable law, Assignor does hereby quitclaim unto Assignee all of Assignor's right, title, and interest in and to any and all refundable tenant deposits (and required interest thereon, if any) in Assignor's possession with respect to the Leases and Contracts as of the date of this Assignment and Assumption Agreement (collectively, the "**Tenants' Deposits**"). "Intangible Property" means the Leases, Contracts, Permitted Exceptions, Permits, General Intangibles, and, if and to the extent quitclaimed hereunder, Tenants' Deposits.

  2. THE INTANGIBLE PROPERTY IS BEING QUITCLAIMED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE DATE OF THIS ASSIGNMENT AND ASSUMPTION AGREEMENT, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. ASSIGNOR SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE INTANGIBLE PROPERTY OR ASSIGNOR'S TITLE THERETO. ASSIGNEE IS HEREBY THUS ACQUIRING THE INTANGIBLE PROPERTY BASED SOLELY UPON ASSIGNEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY ASSIGNOR OR ASSIGNOR'S AGENTS OR CONTRACTORS.

  3. Assignor hereby assigns and transfers to Assignee all claims, demands and causes of action arising from or related to any environmental injury to the Property that may have occurred or originated prior to the date of this instrument. Environmental injury means any injury, damage or loss in value to the Property arising from any spill, leak or release of any hazardous waste, pollutant, oil or petroleum product, or other solid, liquid or gaseous substance that is currently or hereinafter listed, regulated or designated by any state or federal governmental agency as toxic, hazardous or harmful. Assignor makes no representations or warranties to Assignee as to the existence or viability of any such claims, demands or causes of action. Assignee indemnifies and holds Assignor harmless for such claims.

  4. Assignee hereby accepts the foregoing assignment of the Intangible Property and hereby assumes all duties and obligations of Assignor with respect to (a) the Intangible Property for the period on and after the date of this Assignment and Assumption Agreement, save and except those relating to reconciliation of expenses of any kind required under the Intangible Property, which shall be for any time period, including time periods prior to the date of this Assignment and Assumption Agreement, and (b) any and all refundable deposits paid by tenants and contractors (and required interest on those deposits, if any) under the Leases and Contracts as of the date hereof, whether Assignee has received those deposits or interest or a credit therefore at Closing or not. Assignee shall defend, indemnify and hold harmless Assignor from and against any and all "Claims" asserted against or incurred by Assignor in connection with (a) any

acts or omissions, on or after the date of this Assignment and Assumption Agreement, with respect to the Intangible Property, save and except those relating to reconciliation of expenses of any kind required under the Intangible Property, which shall be for any time period including time periods prior to the date of this Assignment and Assumption Agreement, and/or (b) the deposits and interest assumed by Assignee hereunder. "**Claims**" means claims, demands, causes of action, losses, damages, liabilities, judgments, costs and expenses (including attorneys' fees, whether suit is instituted or not).

5.      This Assignment and Assumption Agreement shall be (a) binding upon, and inure to the benefit of, the parties to this Assignment and Assumption Agreement and their respective heirs, legal representatives, successors and assigns, and (b) construed in accordance with the laws of the jurisdiction in which the Real Property is located, without regard to the application of choice of law principles, except to the extent such laws are superseded by federal law.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, Assignor has signed and delivered this Assignment and Assumption Agreement as of the _____ day of _____, 20_____.

**ASSIGNOR:**

By:_____

Print Name:_____

Title:_____

**IN WITNESS WHEREOF**, Assignee has signed and delivered this Assignment and Assumption Agreement as of the _____ day of _____, 20_____.

<b>ASSIGNEE:</b>

By:_____
Print Name:_____
Title:_____

**SCHEDULE 8.1.8**

**Form of Bill of Sale**

---

**BILL OF SALE**

---

_____ a _____, having an address c/o CWCapital Asset Management LLC, 7501 Wisconsin Avenue, Suite 500 West, Bethesda, Maryland 20814 ("**Assignor**"), in accordance with the Purchase and Sale Agreement dated effective _____, 20__ and in consideration of the sum of Ten Dollars ($10.00) (the sufficiency and receipt of which are hereby acknowledged), does hereby quitclaim unto _____ a _____, having an address of _____ ("**Assignee**"), all of Assignor's right, title and interest in and to all of the furniture, furnishings, fixtures, equipment, the vehicle identified in **_Exhibit B_** hereto, and other tangible personal property that is now affixed to and/or located at the Real Property described in **_Exhibit A_** and used in connection with the management, operation, or repair of that Real Property (collectively, "**Personal Property**"). This Bill of Sale does not convey any interest in any liquor license.

TO HAVE AND TO HOLD the Personal Property unto Assignee and Assignee's heirs, legal representatives, successors and assigns forever.

THE PERSONAL PROPERTY IS BEING QUITCLAIMED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE DATE OF THIS BILL OF SALE, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. ASSIGNOR SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE PERSONAL PROPERTY OR ASSIGNOR'S TITLE THERETO. ASSIGNEE IS HEREBY THUS ACQUIRING THE PERSONAL PROPERTY BASED SOLELY UPON ASSIGNEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY ASSIGNOR OR ASSIGNOR'S AGENTS OR CONTRACTORS. ASSIGNOR HAS MADE NO AGREEMENT TO ALTER, REPAIR OR IMPROVE ANY OF THE PERSONAL PROPERTY.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, Assignor has signed and delivered this Bill of Sale as of the _____ day of _____, 20__.

**ASSIGNOR:**

By:_____
Print Name:_____
Title:_____

**IN WITNESS WHEREOF**, Assignee has signed and delivered this Bill of Sale as of the _____ day of _____, 20__.

**ASSIGNEE:**

By:_____

Print Name:_____

Title:_____

Schedule 8.1.8

### SCHEDULE 8.1.9

**Form of Tax Proration Agreement**

---

**TAX PRORATION AGREEMENT**

---

DATE OF CLOSING:         _____

GF. NO.                          _____

PURCHASER:                 _____
                                      _____

SELLER:                        _____
                                      _____

TITLE COMPANY:          _____
                                      _____

PROPERTY:                   **EXHIBIT A**

                                      _____
                                      _____

In connection with the closing of the above-captioned property, the undersigned hereby acknowledge and agree (the "**Agreement**") to the following facts regarding the real estate taxes and assessments, personal property taxes, water or sewer charges not based upon consumption, and other governmental charges based upon the Property (collectively, the "**Taxes**"):

(1)    The proration of Taxes on the Date of Closing was based on the following annual amounts:

a.    Real Property Taxes
      __/__/__ – __/__/__                                      $

b.    Personal Property Taxes
      __/__/__ – __/__/__                                      $

**TOTAL TAX PRORATION (Credit to Purchaser/Seller):**     $

(2)    We hereby consent to the Taxes being prorated on the above amounts and we understand and agree that, Purchaser and Seller shall make no further adjustments or re-prorations of taxes post-closing, including but not limited to, personal property taxes, if any, and any taxes related to Seller's ownership of the Property, which shall be the liability of Purchaser unless prorated herein.

(3)      Purchaser agrees to notify all taxing authorities of the change in ownership of the Property to assure proper receipt of future tax notices.

(4)      Purchaser and Seller acknowledge and agree that the 2018 net assessment value identified in that certain Real Estate Assessment Change Notice dated January 31, 2019 issued by the Department of Finance, Office of the Assessor of the City of Norwalk, Connecticut for the Property determines the net assessment value for the period commencing upon July 1, 2019 through June 30, 2024, unless, subsequent to Closing, Purchaser files a separate appeal during such period.  If, as the result of such appeal of the assessed valuation of the Property for any real estate tax year including the Closing, there is issued after Closing an administrative ruling, judicial decision or settlement by which the assessed value of the Property for such tax year is adjusted, Purchaser acknowledges and agrees that Seller shall not be responsible for any portion of any costs and expenses incurred by Purchaser in connection with such appeal.

(5)      All of the provisions of this Agreement shall be binding upon, and inure to the benefit of, the applicable parties and their respective heirs, legal representatives, successors and assigns.

(6)      If any provision of this Agreement, or the application thereof to any person or circumstance, shall be invalid or unenforceable, at any time or to any extent, then the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby.  Each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

(7)      This Agreement contains the entire agreement between the parties with respect to the proration of Taxes at the Property.   There are no promises, agreements, conditions, undertakings, understandings, warranties, covenants or representations, oral or written, express or implied, between them with respect to the proration of Taxes at the Property, this Agreement, or the transaction described in this Agreement, except as set forth in this Agreement.

(8)      This Agreement may not be modified orally or in any manner, except by an agreement in writing signed by Seller and Purchaser (or their respective successors in interest) and, if and to the extent Title Company is to be bound thereby, by Title Company.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, this Tax Proration Agreement has been signed and delivered as of the _____ day of _____, 20__.

**SELLER:**

_____,
a _____

By:     _____
Name:   _____
Title:  _____

IN WITNESS WHEREOF, this Tax Proration Agreement has been signed and delivered as of the _____ day of _____, 20__.

**PURCHASER:**

_____,
a _____

By:     _____
Name:   _____
Title:  _____

Schedule 8.1.9

**SCHEDULE 8.2.5**

**Form of Certificate of Non-Affiliation**

_____

**CERTIFICATE OF NON-AFFILIATION**

_____

RE:   [Name of Trust]; "[Property Name]", [Property Address] (the "**REO Property**");
CWCapital Asset Management LLC Loan No. _____.

CWCapital Asset Management LLC ("**CWCAM**") is the Special Servicer of the above referenced REO Property under the Pooling and Servicing Agreement dated _____ (the "**PSA**"), between _____ as Depositor, _____ as Master Servicer, and _____, as Trustee for the Registered Holders of_____. Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the PSA.

In accordance with Section _____ of the PSA, CWCAM, in its capacity as Special Servicer, intends to sell the REO Property to _____, a _____ ("**Purchaser**").  Purchaser and its affiliates are not a Certificateholder under the PSA, and further, Purchaser and its affiliates are not the Trustee, its Affiliates or an Interested Person as those terms are defined in the PSA.  Additionally, neither Purchaser nor any partner, officer, director, shareholder or member of Purchaser or any officer, director, shareholder, member or partner of any partner, shareholder or member of Purchaser are related to, affiliated with, or an employee of CWCAM, its representatives or its agents.  By execution hereof, Purchaser represents and warrants the foregoing statements.

**PURCHASER:**

_____,
a _____

By:      _____
Name:  _____
Title:   _____
Date:   _____

<u>**SCHEDULE 8.4.3**</u>

**Form of Indemnification Agreement**

---

**INDEMNIFICATION AGREEMENT**

---

      **THIS INDEMNIFICATION AGREEMENT** (the "**Agreement**") is made and entered into this _____ day of _____, 20____, by and between _____, a _____, having an address of _____ ("**Seller**") and _____, a _____, having an address of _____ ("**Purchaser**").

**WITNESSETH:**

      **WHEREAS**, Seller and Purchaser entered into that certain Purchase and Sale Agreement dated effective _____ (the "**Contract**"), for the sale and purchase of the real property located in Fairfield County, Connecticut, having an address of 789 Connecticut Avenue, Norwalk, Connecticut 06854, which property is also known as the "**DoubleTree by Hilton Hotel Norwalk**" and is more particularly described on <u>**Exhibit A**</u> attached hereto (the "**Property**");

      **WHEREAS**, pursuant to Section 8.4 of the Contract, Purchaser acknowledges the Property is operating as the DoubleTree by Hilton Hotel Norwalk, whose licensor is Hilton Franchise Holding LLC, a Delaware limited liability company ("**Licensor**"), under an existing agreement between Seller and Licensor ("**Operating Agreement**");

      **WHEREAS**, Seller and Purchaser have agreed to a date of closing of _____ (the "**Date of Closing**") regarding the sale of the Property;

      **WHEREAS**, as of the Date of Closing Purchaser has failed to secure a long-term operating agreement (the "**Franchise Agreement**") between Licensor and Purchaser allowing Purchaser to continue to operate the Property as the DoubleTree by Hilton Hotel Norwalk or other Hilton franchise hotel;

      **WHEREAS**, to induce Seller to waive as conditions precedent to closing on the sale of the Property, the receipt of (i) Licensor's consent of sale of the Property pursuant to the terms of the Operating Agreement and (ii) a release from Licensor of all of Seller's obligations under the Operating Agreement, and to enable the parties to timely close on the sale of the Property, Purchaser shall indemnify, defend and hold harmless the Indemnified Parties (defined herein) from and against any and all claims which may arise against Seller under the Operating Agreement from and after the Date of Closing;

      **NOW, THEREFORE**, in contemplation of the foregoing and in consideration of the mutual agreements, covenants, representations and warranties contained herein and in the Contract and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

      1.    **Indemnified Parties.**  Purchaser hereby indemnifies, defends, and holds harmless Seller, Seller's Sole Member/Manager and Seller's servicers, including but not limited to CWCapital Asset Management LLC (collectively, the "**Indemnified Parties**") from and against any and all actual and

contingent liability, damages, loss, costs or expenses, including, without limitation, reasonable attorneys' fees and expenses and court costs, incurred by Indemnified Parties as a result of: (a) an act or omission by Purchaser, its agents, employees or representatives accruing from and after the Date of Closing (the "**Indemnification Period**") and giving rise to a claim or demand against the Indemnified Parties under the Operating Agreement ; (b) any claim of alleged breach by Seller of the Operating Agreement; or (c) any occurrence giving rise to a claim or demand against Indemnified Parties under the Operating Agreement involving the Property which occurs during the Indemnification Period, including without limitation any casualty event at the Property (collectively, the "**Indemnity Obligations**").

2.      **Claims.**

2.1      In the event that any party making a claim or demand shall commence or file any lawsuit or proceeding (individually or collectively, a "**Proceeding**") against Indemnified Parties, which Proceeding is reasonably likely to result in any claim or demand being made under Section 1, then Purchaser shall either, at its option and within ten (10) business days after notice by Indemnified Parties to Purchaser of the filing or commencement of any such Proceeding:

2.1.1      Promptly pay all amounts and otherwise take whatever commercially reasonable actions necessary to dismiss the Proceeding with prejudice; or

2.1.2      Undertake the defense thereof by counsel chosen by Purchaser and approved by Indemnified Parties (which approval shall not be unreasonably withheld, conditioned or delayed), in which case Purchaser shall be obligated to contest and/or defend Indemnified Parties against such Proceeding, at Purchaser's sole cost and expense, and shall keep Indemnified Parties apprised of the current status of such Proceeding at all times. Regardless of whether Indemnified Parties have counsel appointed for them as contemplated above or selects independent counsel, Indemnified Parties shall have the right to participate in the defense of any Proceeding and approve any proposed settlement of such Proceeding.

2.2      Purchaser shall be liable to Indemnified Parties for all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and court costs in connection therewith) actually incurred by the Indemnified Parties in connection with such Proceeding. Indemnified Parties shall cooperate in all reasonable respects with Purchaser (at Purchaser's sole cost and expense) in the contest and/or defense of such Proceeding. Indemnified Parties shall promptly send to Purchaser copies of any material documents received by Indemnified Parties which relate to such Proceeding.  Indemnified Parties (or their agents or representatives) shall have the right but not the obligation to attend meetings and/or conference calls (including, without limitation, with such parties and the attorneys and/or representatives retained by Purchaser) and to otherwise monitor any such Proceedings.

2.3      Notwithstanding the foregoing: (a) if the joint representation of the Indemnified Parties (where  the Indemnified Parties are specifically named as a party to the applicable Proceeding) will create either an actual or potential conflict of interest in the defense of a claim which conflict is unreasonable to waive, including, without limitation, arising under rules of professional responsibility applicable to legal counsel jointly representing the Indemnified Parties, or material and reasonable divergence of business or litigation interests among the joint clients with respect to strategies or objectives in defending the claim, or potential liability exposure in connection with such claim; (b) if Indemnified Parties reasonably determine that Purchaser does not have the financial wherewithal to satisfy its indemnity obligations in any material manner; or (c) if Purchaser fails to (i) make one of the requisite elections under either Sections 2.1.1 or 2.1.2 prior to the expiration of such ten business day period; or (ii) in any way satisfy the foregoing requirements and obligations of this Section 2, Indemnified Parties shall have the right, at Purchaser's sole cost and expense, to take whatever commercially reasonable actions are necessary to dismiss the Proceeding

or to contest and/or defend itself against such Proceeding, provided that Seller shall keep Purchaser apprised of the current status of such Proceeding at all times.

   2.4  Nothing contained in the foregoing or elsewhere in this Section 2 shall apply to, or otherwise cause Purchaser to pay for, any costs or expenses, including attorneys' fees, incurred by Indemnified Parties in connection with any cross-complaint or other claims which may be brought by Indemnified Parties with respect to the matters which are the subject of any such Proceeding or otherwise.

   3.  **Notice.**  All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand, (b) when sent by telecopier, (c) when sent by e-mail delivery to the e-mail addresses set forth below, or (d) one day after being sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses or telecopier numbers set forth below (or to such other addresses, e-mail addresses and telecopier numbers as a party may designate by notice to the other parties):

If to Seller:

   c/o CWCapital Asset Management LLC, Special Servicer
   7501 Wisconsin Avenue, Suite 500 West
   Bethesda, Maryland 20814
   Attn:
   Email:

With a copy to:

   Sheppard Mullin Richter & Hampton LLP
   2200 Ross Avenue, 24th Floor
   Dallas, Texas 75201
   Attn: Carolyn R. Benson, Esq.
   Phone: (469) 391-7421
   Fax: (469) 391-7565
   cbenson@sheppardmullin.com

If to Purchaser:

   Attn:
   Phone:
   Email:

With a copy to:

   Attn:
   Phone:
   Email:

   4.  **Severability.**  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

5.    **Governing Law.**  This Agreement will be governed by the laws of the State of Connecticut without regard to conflicts of laws principles.

6.    **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

7.    **Conjugation and Terms.**  In this Agreement, the singular shall include the plural, and vice versa.  The use of any gender, tense, or conjugation shall include all genders, tenses, and conjugations.

8.    **Background and Section Headings.**  The background is a part of this Agreement.  The headings used in this Agreement are for descriptive purposes only and shall not control or alter the meaning of the Agreement as set forth in the text.

9.    **Strict Compliance and Waivers.**  Failure to insist upon strict compliance with any of the terms, covenants or conditions of this Agreement shall not be deemed a waiver of that term, covenant or condition or of any other term, covenant or condition of this Agreement.  A waiver or relinquishment of any right or power at any time shall not be deemed a waiver or relinquishment of that right or power at any other time.

10.    **Jury Trial.**  EACH PARTY TO THIS AGREEMENT WAIVES HIS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION BROUGHT UNDER OR IN CONNECTION WITH THIS AGREEMENT.

11.    **Amendment.**  This Agreement may be amended, waived, released or terminated only by an agreement in writing signed by all of the parties.

12.    **Benefit.**  This Agreement shall inure to the benefit of the parties, and shall be binding upon and enforceable against the parties and their respective personal representatives, successors, and assigns.


SIGNATURE PAGES ATTACHED; REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.

**IN WITNESS WHEREOF**, Seller has caused this instrument to be duly executed and all applicable seals to be affixed thereto as of the day and year first above written.

**SELLER:**

_____,

a _____

By: _____

Name: _____

Title: _____

Schedule 8.4.3

**IN WITNESS WHEREOF**, Purchaser has caused this instrument to be duly executed and all applicable seals to be affixed thereto as of the day and year first above written.

**PURCHASER:**

_____,

a _____

By:      _____
Name:    _____
Title:   _____

# Exhibit B

## AGREEMENT REGARDING DEPOSIT

**THIS AGREEMENT REGARDING DEPOSIT** (the "**Agreement**"), by and between **789 CONNECTICUT AVENUE HOLDINGS, LLC**, a Maryland limited liability company ("**Seller**"), and **DNA LODGING LLC**, a Connecticut limited liability company ("**Purchaser**"), effective as of the date last signed.

## WITNESSETH:

**WHEREAS,** Seller and Purchaser are parties to that certain Purchase and Sale Agreement dated effective May 3, 2019 (the "**Purchase Contract**"), with respect to that certain real property having a street address of 789 Connecticut Avenue, Norwalk, Fairfield County, Connecticut 06854, and more particularly described in **Schedule 1.1.1** of the Purchase Agreement;

**WHEREAS,** pursuant to Section 3.6 of the Purchase Contract, on June 11, 2019, Purchaser tendered written notice to Seller to terminate the Purchase Contract effective as of said date and requested a return of the full amount of the Initial Deposit; and

**WHEREAS,** notwithstanding anything in the Purchase Contract to the contrary, Seller and Purchaser hereby agree to the return of the entire Initial Deposit to Purchaser.

**NOW, THEREFORE,** in consideration of the foregoing, and in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1.    <u>Incorporation of Recitals.</u>  The foregoing recitals are specifically incorporated in this Termination Agreement by this reference.

2.    <u>Definitions.</u>  Capitalized terms in this Agreement that are not defined in said agreement shall have the same meaning as in the Purchase Contract.

3.    <u>Termination of Purchase Contract</u>. Purchaser hereby warrants and represents that pursuant to Section 3.6 of the Purchaser Contract, Purchaser intended to terminate the Purchase Contract effective as of June 11, 2019 via written notice delivered to Seller of the same date, subject to any surviving rights, liabilities or obligations in accordance with the Purchase Contract, except as otherwise expressly provided in this Agreement. After due investigation and inquiry, Purchaser has ratified and adopted, and hereby ratifies and adopts, all action having been taken by or on behalf of the Purchaser under the Purchase Contract from and after the Effective Date thereunder.

4.    <u>Release of Deposit.</u> Seller and Purchaser hereby acknowledge that the Purchase Contract expressly requires the return of a portion of the Initial Deposit in the amount of One Hundred Thousand and No/100 U.S. Dollars ($100,000.00), and notwithstanding the Purchase Contract to the contrary, Seller and Purchaser agree that the entire Initial Deposit in the amount of Two Hundred Thousand and No/100 U.S. Dollars ($200,000.00) shall be returned to Purchaser. Seller hereby relinquishes all rights and interest in the full amount of the Initial Deposit.

5.    <u>Indemnity</u>. In consideration for the release of the full amount of the Initial Deposit, Purchaser hereby agrees to forever and fully release Seller, and indemnify, defend and hold Seller harmless, from and against any claim, demand, proceeding, loss, liability, damage, loss or expense (including reasonable attorney's fees and costs) arising out of or in connection with the termination of the Purchase Contract and if any representations and warranties set forth in this Agreement are not accurate

and correct.

      6.      Authority. Purchaser further hereby warrants and represents that the individual signing this Agreement on behalf of Purchaser is a duly authorized principal and officer of Purchaser and has all requisite power and authority to bind Purchaser by execution hereof. The Agreement, upon full execution, is in all respects the legal, valid and binding obligation of Purchaser, as Purchaser thereunder, and is enforceable against Purchaser in accordance with its terms.

      7.      Proper Execution. This Agreement shall have no binding force and effect on either party unless and until both Purchaser and Seller have executed and delivered this Agreement.

      8.      Severability. If any paragraph or provision herein is held invalid by a court of competent jurisdiction, all other paragraphs or severable provisions of this Agreement shall not be affected thereby, but shall remain in full force and effect.

      9.      Counterparts. This Agreement may be executed by electronic mail, fax (if promptly followed by the original) and in any number of counterparts, each of which shall constitute one and the same instrument, and either party hereto may execute this Agreement by signing any such counterpart.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement Regarding Deposit, effective as of the date last signed.

**SELLER:**

**789 CONNECTICUT AVENUE HOLDINGS, LLC,**
a Maryland limited liability company

By:    Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of COMM 2015-CCRE23 Mortgage Trust, Commercial Mortgage Pass Through Certificates (the "Trust"), its Sole Member/Manager

By:    CWCapital Asset Management LLC, a Delaware limited liability company, solely in its capacity as Special Servicer to the Trust

By: _____
    Jim Gray, Senior Vice President
Date:    7/8/19

**PURCHASER:**

**DNA LODGING LLC,**
a Connecticut limited liability company

By: _____
Name:   Darshua Gandhi
Title:    Member
Date:    7/2/19